AMERICAN TRUST & BANKING CO. v.

WILLIAMS et al.—225 S. W. (2d) 79.

Eastern Section.    November 15, 1948.

Petition for Certiorari denied by Supreme Court, April 30, 1949.

Moon & Anderson, Miller, Martin, Hitching & Tipton, Finlay, McCoy, Albernathy & Witt, all of Chattanooga,

for American Trust & Banking Co., Executor, and Ruth Johnston Bowen, beneficiary.

John S. Wrinkle, of Chattanooga, for Clay Williams, John C. Williams, Clarence Williams, Roger Williams, Edith Williams, Maggie Belle Vail, Faye Williams Watson, Vance Wrinkle, Stacy Wrinkle, Verna Wrinkle, Elsie Keiper Wrinkle.

George E. Westerberg and V. F. Carmichael, both of Cleveland, for Mrs. Gertrude Haven.

J. F. Atchley, of Chattanooga, for Fred Goodner and Leland Goodner.

McAMIS, J.  This is a will contest involving a purported will dated June 7, 1945, and propounded as the last will and testament of Mrs. Ada Hugger who died September 23, 1945 at the age of seventy.  If valid the will revoked an earlier will executed by Mrs. Hugger in 1930.  At the conclusion of all the evidence, the trial court overruled a motion for a directed verdict in favor of the first will, sustained a motion made by the proponent of the 1945 will as to the charge of undue influence and submitted only the issue of Mrs. Hugger's soundness of mind on June 7, 1945.  The jury's verdict, finding that issue in favor of contestants, was approved and American Trust & Banking Company, Executor, as proponent, has prosecuted an appeal, insisting that there is no substantial, material evidence that Mrs. Hugger was of unsound mind on June 7, 1945.  Contestants have also prosecuted a conditional appeal complaining of the refusal of the court to submit the issues of fraud and undue influence and of the court's refusal to direct a verdict in favor of the will of 1930.

Mrs. Hugger was well educated and intelligent and, at least until she became ill in January 1945, the record is that she was strong willed and quick to resent any attempt to impose upon her generosity by relatives for all of whom she seems to have had a normal affection. She had no children but a number of nieces and nephews some of whom are contestants of the last will and proponents of the first. For convenience we refer to all of the parties in their relation to the second will and consider first the propriety of the court's action in refusing to direct a verdict in favor of that will.

Mrs. Hugger was twice married. Her first husband, Mr. Henson, left her an estate of approximately $100,000.00 at his death in 1917. The estate was administered by the American Trust & Banking Company. Mrs. Hugger, then Mrs. Henson, placed all or a large part of this fund in a living trust for her own benefit with the American Trust & Banking Company, as Trustee, and through its management and the business acumen of Mrs. Hugger herself her estate had increased to $193,000.00 at the date of her death. She received only a relatively small sum from the estate of Mr. Hugger who died in 1938.

The record shows that Mrs. Hugger's favorite among her nieces and nephews was Ruth Johnston, a daughter of one of Mrs. Hugger's sisters. This attachment began when Ruth was a small child and continued until Mrs. Hugger's death when Ruth was 46 years of age, having in the meantime married and become Mrs. Bowen and the mother of Emily Bowen, to whom Mrs. Hugger also became greatly attached. Mrs. Hugger, at one time, considered adopting Ruth but did not because she thought she should stay with her mother. During the

years she was a frequent visitor in the Hugger home, in later years accompanied by her daughter, Emily. Mrs. Hugger paid Ruth's expenses at college, bought her trousseau, corresponded with her and in general seemed to regard her much the same as a daughter and Emily as a grandchild.

When the 1930 will was executed Mr. Hugger was alive. He was the principal beneficiary under that will. Mrs. Johnston, mother of Ruth Johnston Bowen, was the next largest beneficiary with a $20,000.00 bequest to be held in trust and upon the death of Mrs. Johnston to go to Ruth. Other specific bequests were made to other relatives. Some of these legatees, including Mr. Hugger and Mrs. Johnston, died before 1945. Mr. Hugger died without issue and, without a new will, Mrs. Hugger would have died intestate as to a large part of her estate.

By reason of the trusts administered by the American Trust & Banking Company Mrs. Hugger had become well acquainted with the trust officers of the bank, Mr. Chapin, Jr., and Mr. Emerson. She had frequently consulted them on business matters and both Mr. Chapin and Mr. Emerson were in her confidence and trusted by her. In 1944 she began to think of making a new will and requested advice from the Bank as to whether she should make another will. She was advised that she should in order to avoid partial intestacy and, in July 1944, she called Mr. Emerson to her home and told him what she had in mind. Mr. Emerson made notes of the salient provisions to be incorporated in the will which were preserved and have been filed in the record. They show that Mrs. Hugger then had in mind making Mrs. Bowen the residuary legatee and, since the proposed specific bequests amounted to less than $30,000.00, the

principal beneficiary. The next day Mrs. Hugger 'phoned Mr. Emerson to hold up having the will written by an attorney until she could give the matter further study.

In October, 1944, she invited Mr. Chapin and Mr. Emerson to come to her home to again discuss the will and this conference resulted in instructions to have a will drawn by Mr. Horace Boydston, a member of the Chattanooga Bar. Mr. Boydston's name was suggested by Mr. Emerson after Mrs. Hugger stated that she had no attorney. She approved the selection of Mr. Boydston although she did not know him personally. Mr. Boydston thereupon drafted a will from Mr. Emerson's notes and Mrs. Hugger was given and thereafter retained in her possession a copy of it. George Fred Williams, a nephew, under the Boydston draft was to receive $500.00. Under the will as finally executed he was given $5,000.00. Otherwise there are only slight variations between the two drafts.

In December, 1944, Mrs. Hugger became ill and in January was taken to the hospital and it was found that she was suffering from cirrhosis of the liver. Nothing further was done about the will until in March or April when Mrs. Hugger gave instructions to the Bank as to certain minor changes and stated that she would have her nephew call when she was ready to execute the will. The Bank had the changes made by another attorney who largely copied the Boydston will. Meanwhile, Mrs. Hugger's condition had not improved and she re-entered the hospital for treatment. Her abdomen was tapped and seven quarts of fluid removed. She was taken home May 15th but returned for one day to be tapped on May 28th. She began to grow worse on June 5th and Mrs.

Bowen was called from her home in Roanoke, Virginia. About the latter date George Fred Williams instructed the Bank that Mrs. Hugger was ready to 'execute the will. Mrs. Bowen arrived June 6th.

On June 7, 1945, after the Bank closed, Mr. Emerson and Mr. Chapin, Jr., took the completed draft of the will to Mrs. Hugger's home, taking along three women employees of the Bank to act as attesting witnesses, one of them being Mr. Emerson's wife. They remained downstairs while Emerson and Chapin went up to Mrs. Hugger's room, they say, for the purpose of reading and explaining the will to her. Their testimony is that they found Mrs. Hugger propped up in bed; that she recognized them and that they read the will to her going over each item; that she stopped them at one point to say that one of the legatees no longer lived in Atlanta as indicated in the will; that they inquired whether she understood that the $5,000.00 bequest to George Fred Williams would not relieve him of his indebtedness to her; that she replied that she did, that he owed it and ought to pay what he owed her.

The three attesting witnesses were then called into the room. Mrs. Hugger knew Mrs. Emerson and greeted her by name. She told one of them where to find her glasses and a magazine for her to use in signing the will. All five of these witnesses testified that she laughed when Mr. Emerson put her glasses on upside down, and then put them on herself; that she was not satisfied with her first attempt at signing her name, said she thought she could do better and signed it a second time as the will itself shows. It was the opinion of all of these witnesses that Mrs. Hugger was of sound mind.

The day nurse, Mrs. Raynesford, testified that Mrs. Hugger on the morning of the 7th told her that she was expecting some men to discuss a business matter and that she would like for her to leave the room when they came. Mrs. Raynesford was not in the room when the will was executed but was on duty that day. She testified that although Mrs. Hugger was in serious condition she was never in a coma or of unsound mind until about two weeks before her death, September 23, 1945. The testimony of the maid who had worked for Mrs. Hugger for 27 years is to the same effect.

Dr. Shumacker became Mrs. Hugger's physician in 1944. He testified that he saw her either every day or every other day until she died; that she would answer his questions, talking more on some occasions than others; that as usual with any patient her condition varied from day to day; that he never found her in a coma until the last two weeks of her life and that in his opinion she was of sound mind. The testimony of Dr. Shumacker and of other physicians who testified shows that due to failure of the liver to function cirrhosis of the liver results in a toxic condition. Dr. Shumacker thought such poisons might cause the patient to be drowsy but he did not recall that Mrs. Hugger was sufficiently toxic to cause that condition until in September.

The testimony for contestants shows that, following the death of Mr. Hugger in 1938, Mrs. Hugger began to use intoxicants; that she became addicted to the use of alcohol and progressively became more so; that, as shown by the medical testimony, alcoholism is one cause of cirrhosis of the liver and it is insisted that she was an alcoholic and incapable of executing a will after she went to the hospital in January 1945.

Miss Millican, the night nurse who was on duty from 6 P. M. to 6 A. M., testifying for contestants was of opinion Mrs. Hugger was of unsound mind. She based her opinion on the fact that she would "lay like she was unconscious nearly all of the time", would not talk to Dr. Shumacker, appeared to be in a coma and she "didn't think she recognized" two neighbor ladies who visited her one evening. In another portion of her testimony Miss Millican admitted Mrs. Hugger talked to Mr. Henson on June 12th; that when she would answer Miss Millican's questions she knew what she was talking about; that she "knew everybody that ever came in while you were there . . . that talked to her". She further admitted that she was never present when Dr. Shumacker was present and based her statement that she would not talk to him on what someone had told her. She said that, as nurse, she understood the doctor did not want her to talk.

Miss Worst, a roomer in Mrs. Hugger's home until June 12, 1945, testified that she called Mrs. Hugger's relatives on Saturday, June 9th, because Mrs. Hugger had been worse for two or three days; that some days she would talk and other days she would not; that she would "just lie there and stare"; that about June 1st she sent Mrs. Hugger some flowers and that Mrs. Bowen later told her she did not notice the flowers. She did not testify that Mrs. Hugger was of unsound mind and did not remember her condition on June 7th. On cross-examination she said the time when Mrs. Hugger "stared" was in her last illness.

Mrs. Irene Williams testified that Mrs. Hugger was weak and did not talk much about June 1st, appeared to be in a coma part of the time.

Mrs. Mack Hall, a niece of Mrs. Hugger, testified she visited Mrs. Hugger the last Sunday in July 1945 and related what had occurred at a wedding; that she could not tell that Mrs. Hugger realized she was present except when she was leaving she said "Pretty dress" referring to a dress the witness was wearing.

John C. Williams, a brother of Mrs. Hugger, when asked if Mrs. Hugger recognized him after she went home from the hospital in May, testified: "I don't much believe she did unless it was right along at the first, she might have known me . . . she didn't talk . . . she might say something but I don't remember that".

The testimony of George Fred Williams, the nephew already mentioned and a witness for contestants, was in substance that, because of her illness, Mrs Hugger gave him a power of attorney; that she was very sick about the first of June; that he saw her practically every day and saw her on June 7th; that she did not always acknowledge his presence but he "thought she did recognize me when I was there"; that in his opinion she was a person of sound mind on June 7th, the date of the will. The testimony of this witness about the preparations for drafting the will corresponds to that of Emerson and Chapin.

Contestants took the deposition of Mrs. Elsye Keeper Wrinkle. The substance of her testimony is that she corresponded with Mrs. Bowen in 1945 and that Mrs. Bowen's letter which she had destroyed spoke of Mrs. Hugger becoming weaker both mentally and physically.

Contestants also sought to show by Dr. Magill, on the hypothesis of the testimony in the record, that Mrs. Hugger was of unsound mind but Dr. Magill declined to answer because in his opinion the condition of a patient

such as described would vary from time to time, and it would be impossible to determine her sanity without seeing the patient.

Contestants also rely upon the fact that the will names one of the nieces, who lived in another state and had not visited Mrs. Hugger for several years, by her maiden name although she was married and several years previously had introduced her husband to Mrs. Hugger.

It is also said that Mrs. Hugger failed to recognize the rights of a sister, Mrs. Haven, in a home she had bid in at a foreclosure of a deed of trust executed by the Havens—that the understanding was that Mrs. Haven was to have the right to buy the property back.

The foregoing we believe fairly summarizes the material testimony leaving out a considerable amount favorable to proponents. Was it sufficient to take the case to the jury?

■ The law fixes the standard of mental capacity and requires that a testator's mind, at the time the will was executed, must be sufficiently sound to enable him to know and understand the force and consequence of his act. He is not rendered incapable of making a will by mere physical weakness or disease, old age, blunt perception, or failing mind and memory, if his mind is sufficiently sound to enable him to know and understand what he is doing. Smith v. Harrison, 49 Tenn. 230; Nailing v. Nailing, 34 Tenn. 630; Fitch v. American Trust Co., Adm'r, 4 Tenn. App. 87; Bridges v. Agee, 15 Tenn. App. 351, 355; Melody v. Hamblin, 21 Tenn. App. 687, 695, 115 S. W. (2d) 237; Rogers v. Hickam, Tenn. App., 208 S. W. (2d) 34; Cude v. Culbertson, Tenn. App., 209 S. W. (2d) 506, 507; Farmers Union Bank v. Johnson, 27 Tenn. App. 342, 354, 181 S. W. (2d) 369.

In determining testamentary capacity, the mental condition of the testator at the very time of executing the will is the only point of inquiry; but evidence of mental condition both before and after making the will, if not too remote in point of time, may be received as bearing upon that question. Insofar as it has a reasonable tendency to bear upon the mental capacity of the testator when the will was executed, evidence of his physical condition both before and after the date of the will is also admissible. But, apart from its effect upon the mind, the physical condition of the testator has no bearing on the issue. See, generally, cases cited supra.

"Where a testator's sickness is wholly physical, proof of his condition as to lethargy, suffering, or unconsciousness on days preceding or following the execution of the will is entitled to very little consideration." 57 Am. Jur. 127 Wills, Section 135.

" 'The will permits of such prior and subsequent incapacity to be given, but unless it bears upon that period, and is of such a nature as to show the incompetency when the will was executed, it amounts to nothing.' Wigmore on Evidence, Section 233, pages 291-292". Bridges v. Agee, supra, 15 Tenn. App. at page 355.

Evidence of prior mental condition may have much, little or no probative value depending upon the nature and effect of the malady, whether general, habitual, continuous, chronic or progressive or due merely to temporary, superficial, accidental, occasional or intermittent causes or conditions. If the debility falls within the first category, evidence of the testator's condition at a time other than the date of the execution of the will may shift the burden of proof and require the production of affirmative proof of his condition at the very time the will was executed.

■ It is a familiar rule that the mere opinions of lay witnesses as to soundness of mind are not evidence; but, having detailed the conversation, appearance, conduct or other particular fact from which the state of mind may be judged, non-expert witnesses may state their conclusion or opinion. It is the facts detailed, the conduct described which constitute evidence. Fitch v. American Trust Co., 4 Tenn. App. 87, 101; Melody v. Hamblin et al., 21 Tenn. App. 687, 695, 115 S. W. (2d) 237, 243. As said by Judge Felts in the latter case: ". . . a verdict may be directed in favor of the will even where such witnesses have testified that in their opinion the testator was of unsound mind, unless facts and circumstances have been put in evidence which are sufficient to warrant the inference or conclusion that the testator was not of sound mind."

In Rogers v. Hickam, Tenn. App., 208 S. W. (2d) 34, cited supra, the opinion of lay witnesses that the testator was of unsound mind, based upon their statements that before the will was executed he failed to recognize the witnesses, a daughter and her husband, that he stared and looked wild, and other circumstances detailed in the opinion, as against positive testimony that his mind was sound at the very time the will was executed, was held insufficient to support a verdict against the will. A verdict was directed for the will in that case and in Fitch v. American Trust Company, supra, because the court determined as a matter of law that the facts and conditions related afforded no reasonable basis for the verdict.

■ In this case there is no medical testimony, based either upon an examination of the testatrix or hypothetical, to support the contestants' claim of unsoundness

of mind. The circumstances detailed by the lay witnesses are reduced to this: The testatrix refused to converse, was not alert and did not appear to notice or recognize acquaintances, neighbors and relatives, appeared to be in a coma at times and seemed to "stare". None relates a single instance of irrational act or speech, of delusions or hallucinations indicative of a troubled or diseased mind.

Against this evidence, the undisputed evidence shows that Mrs. Hugger's doctor advised her to do little talking because of her grave physical condition, that her condition varied from day to day, that as appears from the testimony of the day nurse and her physician she was never actually in a state of coma or unconsciousness during the daytime until about two or three weeks before she died and, at the time the will was executed, she was conscious and rational, made suggestions as to the physical execution of the will and discussed intelligently its provisions. These circumstances clearly suggest the possibility that Mrs. Hugger's mental condition was different from what it seemed to witnesses for contestant; that she was never in a coma but only seemed to be because of her weakened physical condition; that she did not talk because it was an effort to do so and against the directions of her physician. But, however, this may be, in view of the evidence that her condition varied from day to day and the absence of any evidence of prior mental disability of a continuous, persistent and progressive nature, which would tend to exclude the hypothesis of testamentary capacity at any time, we think it must be said that there is no substantial, material conflict between contestants' proof and the positive testimony of the five witnesses who were present when the will was executed.

It is insisted that the terms of the will, the illegibility of the signature and the bequest to one of the nieces who was married in her maiden name constitute evidence of unsoundness of mind.

We have referred to the affection of Mrs. Hugger for Mrs. Bowen and her daughter, Emily. Mrs. Bowen's mother was given the largest bequest in the 1930 will with provision for Mrs. Bowen after her mother's death. Mrs. Bowen was given the largest bequest under the 1945 will even considering Emily as a beneficiary in her own right. The will otherwise follows the general pattern of the 1930 will taking into account changes that had occurred meantime. The bequest to George Fred Williams, it is true, was increased from $500.00 to $5,000.00 but the record shows as a possible explanation that he had performed valuable services for Mrs. Hugger during the last year of her life in looking after her affairs during her illness. The will contains specific bequests to legatees other than Mrs. Bowen of $39,000.00. The inheritance tax amounting to approximately 25% of the estate, under the terms of the will, is not to be deducted from these bequests but paid out of the general estate thus substantially reducing the residuary estate going to Mrs. Bowen and her daughter. The financial worth of Mrs. Bowen and her husband was not shown. Presumably the testatrix, in establishing the trust for their benefit, had their needs in mind and provided for their future support as she thought their needs would be and as the testatrix wished. Just how much the trust will yield does not appear from the record.

In any case, the law does not require a testator to dispose of his property according to the notion of others as to what would be an equal or just division of

his estate, Farmers Union Bank v. Johnson, 27 Tenn. App. 342, 350, 181 S. W. (2d) 369, though a wholly unnatural will which disregards all ties of natural relationship and affection may be looked to by the jury, along with other circumstances, as evidence of an unsound mind and that the testator acted under a delusion. Melody v. Hamblin et al., 21 Tenn. App. 687, 699, 115 S. W. (2d) 237.

It is said the will was unnatural because it excused the Bank as Trustee from giving bond and permitted it to make investments not permitted by the statute governing investments by fiduciaries. The testatrix may have considered these provisions as advantageous in relieving the estate of the expense of premiums on the bond and as enabling the Trustee to invest in common stocks or other property which would yield an income larger than investments permitted under the statute. These provisions did not lessen the liability of the Trustee but only enlarged its powers.

It is also insisted Mrs. Hugger breached an agreement with Mrs. Haven to permit her to repurchase the home in Cleveland. The evidence is not clear as to the agreement but Mrs. Haven had not purchased the home in the seven years between the date of the purchase and the date of the will. Under the will she is given the right to live in it as long as she lives and, instead of being given $15,000.00 as in the 1930 will, she is given, in addition to the use of the house rent free, $15,000.00 in trust for life.

We do not find any intrinsic evidence of unsoundness of mind in the will of 1945. On the contrary, the dispositions made under it seem to us to comport

with the affections of the testatrix and with her plans of long standing.

The illegibility of the signature is fully explained by the physical condition of the testatrix as shown by the proof both for contestants and proponents.

It is true the 1945 will fails to name one of the nieces by her married name, but the proof shows that Mrs. Hugger had seen her only once, in 1940, and never corresponded with her. She was remembered to the extent of $500.00. We do not think under the circumstances the failure to remember her married name is evidence of mental unsoundness.

For the reasons indicated and after the most careful consideration, we have concluded that the learned circuit judge erred in not directing a verdict on the issue of insanity. The assignment complaining of this action is sustained.

Much that has already been said is pertinent to contestants' insistence, on their conditional appeal, that the court erred in directing a verdict in favor of proponent on the issue of undue influence.

It is insisted that the Bank influenced Mrs. Hugger to execute the 1945 will in order that it might act as Trustee of her large estate for many years with the possibility, under certain contingencies, of serving for as long as 40 years and that Mrs. Bowen also unduly influenced her to execute another will to replace the will of 1930.

It is noted at the outset that the Bank was named Executor under both wills. Under the first will it was to act as Trustee for only one of the beneficiaries, while under the 1945 will the greater part of the estate was to go to it as Trustee. The Bank therefore may have desired that Mrs. Hugger execute a new will. But we find

no evidence that it exercised any influence to that end except to advise Mrs. Hugger that it was advisable, in view of the death of her husband and other changes, that she execute a new will. It seems to us that the circumstances warranted the advice and the proof shows that it was given in response to Mrs. Hugger's request for advice. The evidence is all to the effect that Mr. Emerson and Mr. Chapin each time any action was taken acted only when requested to act, that Mrs. Hugger in each instance took the initiative and that no effort was made to influence or suggest the disposition to be made of any part of the estate. We think it most reasonable that Mrs. Hugger's past experience with the Bank induced her to make it Trustee under the new will.

The evidence as to Mrs. Bowen shows that she talked to Mrs. Hugger about making a new will a number of times but there is no proof that she made any effort to influence her to make a devise favorable to her. This, of course, falls far short of undue influence. To cite authorities would be superfluous.

A judgment will be here entered reversing the judgment and sustaining the will as on directed verdict for proponent. The cause will be remanded and costs paid out of the estate.

Howard and Goodman, JJ., concur.