In re ESTATE OF James B. ELAM.

Vincent ELAM, Contestant/Appellee,

v.

Edwin A. OAKLEY, Evelyn Griffin and
Claudia Griffin, Proponents/Appellants.

Supreme Court of Tennessee,
at Nashville.

May 26, 1987.

Clark H. Tidwell, Taylor, Schlater, Lassiter, Tidwell & Trentham, Nashville, for proponents/appellants.

Sandra Jones, Vance Cramb, Jr., Nashville, for contestant/appellee.

## OPINION

BROCK, Chief Justice.

We granted the rule 11 application in this case, a will contest, to address the adequacy of jury instructions as well as whether there was material evidence to support the jury verdict.

The testator, Mr. James Elam, executed three wills within the four months preceding his February 4, 1982, death at the age of seventy-nine. On October 27, 1981, he executed a will naming Mr. Milton Griffin, his foster son, as the primary beneficiary. He subsequently named his brother, Mr. Vincent Elam (the contestant) and his family as primary beneficiaries in a will executed November 9, 1981. Finally, on January 4, 1982, he executed a third will leaving the bulk of his estate to the wife and daughter of Milton Griffin (the proponents).

The January 4 will was filed in probate court. Vincent Elam contested the will on grounds of undue influence and lack of testamentary capacity and the matter was certified to circuit court for trial. In the first trial, the jury returned a verdict for the proponents of the January 4 will, but in an unreported decision, the Court of Appeals reversed because of an omission in the trial judge's instructions. At the new trial, the jury again found for the proponents of the January 4 will. On appeal the Court of Appeals reversed and remanded for a new trial, holding that certain of the instructions were erroneous. We respectfully disagree and reinstate the jury verdict.

## I.

The following facts are pertinent to the issues presented for review. On October 21, 1981, the testator's wife of 57 years died unexpectedly. The couple had had no natural children, but they had taken into their home a foster son, Milton Griffin, at the age of 12. He remained in their home until his marriage, seven years later, in 1948. Since that time, Griffin and his family had lived close by and foster father and son had enjoyed a good relationship. At the time of Mr. Elam's death, the Griffins lived on the same street as his foster father, separated by one house.

The death of his wife shook the testator, and he wanted to be relieved from the responsibility of taking care of his personal business. At this time, he also suffered from an undiagnosed malady in his leg, causing him to limp and making it difficult for him to drive. For these reasons, he executed a power of attorney in favor of Griffin, enabling the latter to take care of his personal business. The testator also executed the October 27 will at this time.

The testator had a drinking problem, which became more serious after the death of his wife. Milton Griffin became concerned about his foster father driving while intoxicated. Pursuant to the power of attorney and without discussing the matter with his foster father, he sold the latter's automobile. This action did not please the testator and on November 9, 1981, he revoked the power of attorney. The two men did not communicate again until November 30, when Griffin went to the testator's house at the request of the latter to help him fill out some Medicare papers. They had a pleasant conversation, but relations remained strained.

There was evidence that the testator and his brother had been estranged for a number of years. After the revocation of the power of attorney, Vincent Elam and his wife visited the testator for a couple of days. They came and went from the testa-

tor's house throughout the month of December, staying all of the first two weeks. On December 9, the testator executed a new will which primarily benefitted Vincent Elam and his family. During this period, the testator also purchased another car.

Ill-will had developed by this time between Griffin and Vincent Elam. As a result, Griffin stayed away from the testator's house during December, although he talked to him by telephone.

On January 1, 1982, the testator telephoned his foster son requesting him to make a doctor's appointment to check his leg which was hurting him. He also said that he wanted to make a will.

The next day, a Saturday, Griffin went to the testator's house. His foster father's leg appeared to be in bad shape and Griffin agreed to make a doctor's appointment for the following Monday. The testator brought up the subject of the will. Although Griffin knew of the October will, he was unaware of the December 9 will and remained so until after the testator's death. He did not question his father, however, but took notes as to his father's wishes. Mr. Griffin did not suggest to the testator how to dispose of his property, but he did suggest the name of an attorney, Mr. Bob Young, to draft the will and to serve as its executor. Mr. Young was a neighbor who had known both the testator and Mr. Griffin for several years. Griffin took the notes to Young who prepared the will based on the notes given him.

On Monday, Griffin drove the testator to the doctor's office. The doctor determined that the testator had a severe case of phlebitis and wanted him hospitalized that day. Before going to the hospital, the testator insisted, against Griffin's advice, on executing the new will. Mr. Griffin drove his foster father to the attorney's office where the January 4 will was executed. He then was hospitalized and died a month later.

## II.

■ The contestant argues that the trial judge should have directed a verdict in his favor either because the testator lacked testamentar˙ capacity when he executed the January 4 will, or because Milton Griffin procured the will through undue influence. The proponents of the January 4 will established its due and formal execution. The contestant, therefore, had the burden of proving lack of testamentary capacity or undue influence. *In re Estate of Rhodes*, 222 Tenn. 394, 436 S.W.2d 429, 435–36 (1968).

We discuss both issues bearing in mind the following:

> It is the long established rule in this State that in reviewing a judgment based upon a jury verdict the appellate courts are not at liberty to weigh the evidence to decide where the preponderance lies, but are limited to determining whether there is material evidence to support the verdict; the appellate court is required to take the strongest legitimate view of all of the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary. Having thus examined the record, if there be any material evidence to support the verdict, it must be affirmed ...

*Electric Power Board v. St. Joseph Valley Struct.*, 691 S.W.2d 522, 526 (Tenn.1985).

## TESTAMENTARY CAPACITY

■ The law requires that the testator's mind, at the time the will is executed, must be sufficiently sound to enable him or her to know and understand the force and consequence of the act of making the will. *American Trust & Banking Co. v. Williams*, 32 Tenn.App. 592, 225 S.W.2d 79, 83 (1948). The testator must have an intelligent consciousness of the nature and effect of the act, a knowledge of the property possessed and an understanding of the disposition to be made. *Goodall v. Crawford*, 611 S.W.2d 602, 604 (Tenn.App.1981). While evidence regarding factors such as physical weakness or disease, old age, blunt perception or failing mind and memory is admissible on the issue of testamentary capacity, it is not conclusive and the testator is not thereby rendered incompetent if her mind is sufficiently sound to

enable her to know and understand what she is doing. *American Trust, supra;* 79 Am.Jur.2d *Wills* § 77 (1975).

■ The opinions of lay witnesses are admissible on soundness of mind if they are based on details of conversations, appearances, conduct or other particular facts from which the state of mind may be judged. *American Trust, supra,* 225 S.W.2d at 84. Further,

[i]n determining testamentary capacity, the mental condition of the testator at the very time of executing the will is the only point of inquiry; but evidence of mental condition both before and after making the will, if not too remote in point of time, may be received as bearing upon that question.

Insofar as it has a reasonable tendency to bear upon the mental capacity of the testator when the will was executed, evidence of his physical condition both before and after the date of the will is also admissible. But, apart from its effect upon the mind, the physical condition of the testator has no bearing on the issue ...

*Id.,* quoted in *Taliaferro v. Green,* 622 S.W.2d 829, 834 (Tenn.App.1981).

■ The proponents offered several witnesses who testified to the soundness of the testator's mind. Bob Young, the attorney who drafted the will, had known the testator for several years and had often visited with him. On January 4, 1982, the testator acted no differently than in their earlier visits. Although he was in physical pain, he appeared mentally alert and sober. He and Mr. Young engaged in small talk. The testator told Mr. Young that the doctor was putting him in the hospital. He exhibited an understanding of the business at hand. For instance, he told Young not only that he intended to leave his automobile to his wife's brother, Mr. Edwin Oakley, but gave as his reason, that his wife had asked him to remember her side of the family. While proof of the reason for making a disposition is not necessary, it is nevertheless relevant to show the testator knew the force and consequences of his act.

Mr. Lloyd Smith, a Baptist minister, testified that he had known the testator since 1955 in connection with church activities. They had a close relationship. Although he was not pastor of the testator's church when his wife died, he officiated at her funeral and counselled with the testator during the months that followed. He did not see the testator on January 4, but he saw him in December and then quite frequently after his hospitalization.

Smith testified that the testator appeared to be in full possession of his mental faculties up until death. The testator knew why he was in the hospital. He admitted his drinking problem to Smith and discussed it. In their conversations, the testator expressed his love and respect for Milton Griffin, and the fact that he was upset with his brother for not having visited him over the years. These sentiments expressed by the testator were similar to conversations Smith had had with the testator during their long friendship.

Mrs. Robert Clinard was a bank teller who had known the testator as a regular bank customer since the late 1940's. When at the bank the testator always stopped to talk with her and on January 4, he had a conversation with her telling her that he was going into the hospital and that he missed his wife. The foregoing witnesses all testified that the testator was of sound mind. Their testimony along with similar testimony from Milton Griffin is material evidence supporting the jury verdict. We note in particular that although the testator had a drinking problem, there was no evidence that he was intoxicated, or even drinking, on January 4, or that his drinking problem was such as to impair his testamentary capacity. *See generally In re Estate of Rhodes, supra,* 436 S.W.2d at 436, for the rules regarding the effect of drunkenness on the capacity of the testator.

The contestant relies upon evidence not detailed here which he introduced and upon which the jury could have reached a contrary verdict. Given the material evidence on behalf of the proponents, however, the trial judge properly submitted this issue to the jury for resolution.

## UNDUE INFLUENCE

█ The contestant argues that the relationship between Milton Griffin and the testator as well as Griffin's activities in connection with the January 4 will constituted undue influence on the testator. As a result, he argues that the will was presumptively invalid, that the burden shifted to the proponents to prove that the will was free from undue influence, and that the proponents failed to meet this burden.

In *Richmond v. Christian*, 555 S.W.2d 105, 107 (Tenn.1977), we held that "[i]t is well established that when two parties enter into a confidential or fiduciary relationship and the dominant party receives a gift or other benefit from the other party, it is presumed that some improper advantage was taken '... either of the confidential relation existing ... or of the weakness and frailty of the party from whom the benefit was received ...' thus rendering the transaction invalid."

*Kelly v. Allen*, 558 S.W.2d 845 (Tenn. 1977), discusses the rules regarding undue influence as they pertain to gifts between a parent and a child, rules which are equally applicable to wills. The normal relationship between a mentally competent parent and an adult child is not *per se* a confidential relationship and it raises no presumption of the invalidity of the transaction. *Id.* at 848.

> In order for such a presumption to arise there must be a showing that there were present the elements of dominion and control by the stronger over the weaker, or there must be a showing of senility or physical and mental deterioration of the donor or that fraud or duress was involved, or other conditions which would tend to establish that the free agency of the donor was destroyed and the will of the donee was substituted therefor.

*Id.*

These rules apply to the facts in the instant case. Although the testator never formally adopted Milton Griffin, the proof already detailed warrants a conclusion that from the time Griffin was taken into the Elam home at the age of twelve until the death of the testator, the two men enjoyed a parent-child relationship.

We find that there is material evidence from which the jury could have concluded that the contestant failed to meet the burden of proving the will presumptively invalid. Milton Griffin did exercise control over his father's affairs during the period of time between October 26, 1981, and November 9, 1981, when he acted under his father's power of attorney. Following the revocation of the power of attorney and until the preparation of the January 4 will, however, Milton Griffin rarely saw his foster father. He exercised little, if any, influence on him and no undue influence on him during this period.

During this time, the testator suffered pain in his leg but he remained ambulatory until his hospitalization. He had some difficulty in caring for himself, caused primarily by his depression and sorrow over his wife's death. Nevertheless, he did not require constant attention, and he was able to live alone for much of this time. There were others available to meet his needs, primarily housekeeping. Moreover, he did not suffer any significant mental deterioration as a result of his depression.

The testator did not depend on Milton Griffin or his family after the revocation of the power of attorney. This conclusion is unaffected by the events surrounding the execution of the January 4 will.

The preparation of the January 4 will was initiated by the testator who called Griffin on January 1. Griffin's activities in preparation of the will consisted of taking notes, pursuant to the testator's instructions, and giving the notes to an attorney. He made no suggestions and gave no advice as to the disposition of the testator's property. There is nothing in the record to indicate that the January 4 will was not faithful to the wishes of the testator as dictated by him. Other than suggesting the name of an attorney to draft the will and act as executor, Griffin in effect acted only as a messenger between his foster father and the attorney. We note also with regard to the influence of Griffin that on the day the will was executed, the testator

ignored Griffin's advice to wait, and insisted instead on having the will executed prior to entering the hospital.

The facts in the instant case are thus readily distinguishable from those in *Turner v. Leathers*, 191 Tenn. 292, 232 S.W.2d 269 (1950) on which the contestant relies. In *Turner*, the donor was ninety years old, bedridden, feeble in mind and suffering frequent spells of unconsciousness. He lived with the donees who fed him, nursed him and did his washing. He was unquestionably under their dominion and control and accordingly we held that for the gift to stand, the donor must have competent and independent advice, free from the influence of the donees.

In a similar case, *Richmond v. Christian, supra*, the donor suffered gradually deteriorating health, ultimately resulting in her hospitalization and restricting her to bed. As a result, the donee, her son, came to live with and take care of her. She was totally dependent upon the donee for the conduct of her business transactions and for her personal needs. We held that under these circumstances, her decision shortly prior to her death to convey all of her real property to the son rather than dividing the property equally among her children as had been her previous intention, was presumptively invalid.

These cases are not analogous to the instant case for at least two reasons. First, the condition of the testator when he executed the January 4 will was not as serious as that of the donors in *Richmond* and *Turner*. Second, Milton Griffin did not exercise the dominion and control which the donees exercised in *Richmond* and *Turner*. In this regard, the instant case is more similar, though not completely analogous to, *Kelly v. Allen, supra*. In *Kelly*, the donor initiated the transaction in question by writing her daughter, asking her to come home immediately for the purpose of conveying property to her. Neither the parent/child relationship nor the fact that the daughter, on her arrival, engaged an attorney and a notary to prepare the documents operated to invalidate the conveyance. These actions, similar to those taken by Milton Griffin in the instant case, merely assisted in finalizing a transaction already decided upon.

### III.

The Court of Appeals reversed the jury verdict and remanded for a new trial because of improper jury instructions. The court held that the jury instructions did not make clear that the contestant had only to prove *either* undue influence *or* lack of testamentary capacity, but not both, in order to invalidate the will.

■ In reviewing a jury charge, an appellate court considers the charge as a whole in determining whether prejudicial error has been committed. *Abbot v. American Honda Motor Co.*, 682 S.W.2d 206, 209 (Tenn.App.1984). The specific portion of the charge complained of must be viewed in connection with its context. *Carman v. Huff*, 32 Tenn.App. 687, 227 S.W.2d 780 (1949). "Even if a portion of the judge's charge might be objectionable, if it is explained and corrected in other parts of the charge so that the jury will not be mislead, this will not be reversible error." *Smith v. Parker*, 213 Tenn. 147, 373 S.W.2d 205, 209 (1963).

■ The trial judge explained to the jury that it was being called upon to determine the validity of the last three wills executed by the testator. He then instructed the jury that two issues were to be considered regarding each will as follows:

Now, in considering the question of the validity of each of these wills, and each should be considered separately; but, as I have said, if you find any will valid, you may stop there and report back to the court. In considering the question you should consider whether or not the testator, whether or not Mr. J.B. Elam, had the necessary testamentary capacity, whether or not he was mentally capable of making a will of his own free will at the present time under consideration.

Now you should also consider and address in each of these wills individually whether or not the will was done of his own free will or volition or whether it

was produced out of what is known as undue influence. So the two issues to be considered should be that.

The trial judge later instructed the jury:

The only issues would be whether or not Mr. Elam, the deceased, had testamentary capacity *and* whether or not the will was of his own free will and volition, that it was not produced under some influence. [Emphasis supplied.]

The Court of Appeals found the "and" significant. In context, however, the instruction merely reiterates the earlier instruction that there were two issues for the jury. It does not amount to an instruction that the contestant is required to prove both undue influence and lack of testamentary capacity in order to prevail.

Immediately thereafter, the judge instructed the jury that: "A will which, at the time of its execution, is made by a person who is not of sound and disposing mind is not valid." After reviewing the law regarding testamentary capacity, the judge then moved to undue influence, instructing the jury: "A will which is brought about by undue influence may not be admitted to probate." These instructions, taken together, informed the jury that either undue influence *or* lack of testamentary capacity would invalidate the will.

Near the end of the charge, the trial judge gave the following instruction which the Court of Appeals found objectionable.

Now, if you find that that will was invalid because of undue influence, *and* also they have the burden to prove it to you, that Mr. Elam did not have testamentary capacity on January 4 to make his will. If you find that he did not have testamentary capacity or that it was procured by undue influence, you must find that will to be invalid. You must find, in other words, that it was a will made of his own free will and volition; he was not induced to do it because of others; and, too, that he had testamentary capacity. Then you will find for the proponent of the will. You will find in favor of the January 4 will. If you find negatively, that is, that it was procured by an undue influence or that it was procured at the time when Mr. J.B. Elam did not have testamentary capacity, then that will must be found to be invalid by you; and then you must go to the second will or the December will.

The burden of proving to you the test of testamentary capacity and/or undue influence rests upon the contestant of the will in question. Burden of proof means that they must prove to you by a preponderance of the evidence, facts necessary to their side of the case or that Mr. J.B. Elam did not have testamentary capacity *and* that it was procured by undue influence. Also, should you go to the second will, the December will, the burden of proving that will was invalid is upon the Griffins or Mr. Tidwell's clients. In other words, they must show that the testator did not have testamentary capacity or it was brought about by undue influence and, to reiterate, one alone will set aside, will make the will invalid. If you find that will invalid, then you must go to the same questions as you did in the first one. [Emphasis supplied.]

The Court of Appeals found that the "and" in the first sentence of the first paragraph was confusing. In context, however, the "and" refers to the fact that the contestant had the burden of proof on the issue of undue influence. Moreover, we note that the first sentence as it has been transcribed is not a complete sentence. The sentence is completed by the second sentence of the first paragraph in which the trial court clearly instructed the jury that lack of testamentary capacity *or* undue influence would invalidate the will. The last sentence of the paragraph reiterates this instruction while the third sentence instructs the jury that in order to find the will valid, it must find *both* testamentary capacity *and* lack of undue influence. Thus, although the language in the first sentence may be awkward and the sentence itself incomplete, the paragraph as a whole leaves no doubt as to the law to be applied by the jury.

The Court of Appeals found similarly confusing the "and" in the second sentence of the second paragraph. Read in context

with the first sentence of that paragraph, however, the trial judge is instructing the jury that the contestant has the burden of proof on both issues. Any doubt as to his meaning is clarified by the fourth sentence in which the trial judge reiterates that the contestant need prove only lack of testamentary capacity *or* undue influence.

On the whole then we find that the jury instructions correctly informed the jury that it had two issues, undue influence and testamentary capacity, to decide, that the burden of proof lay with the contestants on both issues, and that the contestant need only prove one of the two grounds in order to prevail.

Accordingly, we reverse the judgment of the Court of Appeals and reinstate the judgment of the trial court. Costs incident to this appeal are taxed to the appellee.

FONES, COOPER, HARBISON and DROWOTA, JJ., concur.