IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 6, 2003 Session

# IN RE THE ESTATE OF OLLIE McCORD

# JOANN HEINRICH v. HELEN BROOKS

**Appeal from the Probate Court for Davidson County**
**No. 01P-390      Frank Clement, Jr., Judge**

---

**No. M2003-00175-COA-R3-CV - Filed March 12, 2004**

---

This is a will contest. The will disinherited two of the decedent's five living children and the one child who had predeceased her. One of the disinherited children contested the will, asserting that the decedent did not have the mental capacity to execute a valid will. Four years prior to the will's execution, the decedent had been diagnosed with dementia, a progressive mental disorder. Based on witness testimony, the trial court found that, on the date the will was executed, the decedent had the mental capacity to execute the will. The will was admitted into probate. The will contestant appeals. In deference to the trial court's determinations of credibility, and in light of the weight of the evidence demonstrating capacity, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Probate Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

Charles Galbreath, Nashville, Tennessee, for the appellant Joann Heinrich.

John E. Clemmons, Nashville, Tennessee, for the appellee Helen Brooks.

**OPINION**

In 1991, Ollie McCord ("Mrs. McCord"), born in 1913, lived at McKendree Manor Nursing Home ("McKendree Manor") in Nashville, Tennessee. Mrs. McCord had lived at McKendree Manor since 1988. She suffered from a variety of conditions, including diabetes and dementia. Mrs. McCord had six children: Plaintiff/Appellant JoAnn Heinrich ("Heinrich"), James Patterson McCord ("James McCord"), Defendant/Appellee Helen Brooks ("Brooks"), Carolyn Allen, and Patsy Byers, all of whom were living in 1991, and Samuel Harold McCord, who was deceased.

Sometime in 1991, Brooks contacted an attorney, David Parsons ("Parsons"), whose eighteen year law practice focused on wills and estates, about preparing a will for Mrs. McCord. Parsons met with Mrs. McCord at McKendree Manor. After ascertaining her wishes for her estate, Parsons drafted a will for her.

On July 19, 1991, Parsons came to McKendree Manor for Mrs. McCord to execute her will. At the time of the will's execution, Mrs. McCord was seventy-seven years old. Present at the signing of the will were Parsons and two witnesses. The will disinherited two of Mrs. McCord's children, Heinrich and James McCord, as well as her deceased son, Samuel McCord. Mrs. McCord's remaining children, Defendant/Appellee Brooks, Carolyn Allen, and Patsy Byers, were all named as beneficiaries in the will. Brooks was to be appointed executrix of the estate.

Mrs. McCord died on May 10, 1999. On March 8, 2001, the executrix, Brooks, filed a petition to probate Mrs. McCord's will. On March 19, 2001, Heinrich filed an objection to probate, alleging that Mrs. McCord was unable to make a valid will, that Mrs. McCord had been subjected to undue influence, and that the will did not list all of the estate's assets. The dispute went to trial on January 8, 2002.

At the outset of the trial, the trial judge sought to define the issues that were to be tried. He asked counsel for the contestant Heinrich:

> Court: I assumed in a nutshell your contest is based upon mental capacity or lack thereof and undue influence? Or is it just capacity?

> Mr. Galbreath: Just the capacity.

Therefore, the trial proceeded on the sole issue of Mrs. McCord's mental capacity to execute the 1991 will.

As the trial began, Brooks introduced evidence that the will was validly executed. First, Parsons testified about the process he used to prepare and execute Mrs. McCord's will. After Brooks' initial contact with Parsons' law firm, Parsons consulted with Mrs. McCord directly at McKendree Manor to determine whether she wanted him to prepare her will. Parsons testified that, after his meeting with Mrs. McCord, he had no doubt that she knew what she was doing and that she wanted him to prepare her will. Mrs. McCord hired Parsons to prepare her will. Parsons then wrote a draft and returned to McKendree Manor, where he reviewed and altered the document with Mrs. McCord. Parsons testified that he questioned Mrs. McCord closely about her desire to disinherit some of her children and their issue, to make certain that disinheritance was truly her intent. Her responses convinced Parsons that "she was oriented as to time and place. . . . that she knew who her family members were. . . . what her assets were . . . . [and] exactly what was taking place."

On July 19, 1991, Parsons returned to McKendree Manor for execution of the will. He brought with him two witnesses: his assistant, Deborah McFall, and his wife, Mary Theresa Ball ("Ball"), herself a licensed attorney. In the presence of the two witnesses, Parsons again reviewed the will with Mrs. McCord, to ensure that she understood it, especially the disinheritance provisions. Satisfied that she understood the document, who her family was, and what assets she owned, Parsons invited Mrs. McCord to execute the will. Parsons testified: "There was no question in my mind that she knew what she was doing. If I did not believe that she knew what she was doing, we would have come back a fourth or a fifth or a sixth time or stop coming back if she'd asked me not to bother her."

Parsons' spouse, Ball, testified about witnessing the execution of the will. Ball testified that, after meeting Mrs. McCord and visiting with her for a few minutes, she did not doubt Mrs. McCord's competency to make the will: "I had no concerns. She appeared perfectly competent to me. I would not have signed if I had thought there was a problem."

The will contestant, Heinrich, then introduced evidence to dispute Mrs. McCord's capacity to execute the will. Heinrich offered the testimony of Murray Smith, M.D., ("Dr. Smith"). In November 1987, in preparation for Mrs. McCord's admission to McKendree Manor, Dr. Smith performed a "mini-mental exam" on Mrs. McCord. Dr. Smith diagnosed Mrs. McCord as having diabetes mellitus, chronic brain syndrome, and spinal stenosis. He defined chronic brain syndrome, also referred to as dementia, as "a progressive mental deterioration in multiple areas of functioning of the brain." He testified that a lay person would not be able to tell that someone suffered from dementia if the person with dementia was not vocal. Based on the results of the November 1987 exam, Dr. Smith testified that Mrs. McCord would not have been competent to execute her will in July 1991. He testified that, at the time of the 1987 evaluation, Mrs. McCord was unable to make any important legal or personal decisions on her own. With dementia, he opined, her mental condition would only worsen.

In support of his assertion, Dr. Smith referred to records of medical professionals who subsequently treated Mrs. McCord. One record, dated April 24, 1991, documented an observation by Deborah Montgomery, M.D. ("Dr. Montgomery"), the medical director of McKendree Manor at the time of the will's execution, and Mrs. McCord's personal physician from October 1989 until September 1992. The record by Dr. Montgomery indicated that, due to her dementia, Mrs. McCord had been unable to describe where she was experiencing pain on that particular day. In a later document, Dr. Montgomery indicated that, on or about April 25, 1991, Mrs. McCord would not have been competent to intelligently dispose of her property. Dr. Smith also referred to a record by Fred Kimbrell, M.D., who performed a consultation for Dr. Montgomery on April 25, 1991, in which Dr. Kimbrell related how Mrs. McCord's mental condition made it difficult for her to describe her physical symptoms. Finally, Dr. Smith testified that he had reviewed the nurses' notes at McKendree Manor regarding Mrs. McCord from 1987 to 1991. Dr. Smith testified that the nurses' notes revealed nothing that indicated improvement in Mrs. McCord's mental condition from the time Dr. Smith administered the "mini-mental health exam" in 1987. Dr. Smith observed that the nurses' notes consistently indicated that Mrs. McCord was confused and lacked the ability to solve even simple

problems.  However, Dr. Smith admitted that there were no nurses' notes from June 26, 1991 through July 24, 1991, a period of time which included the day on which Mrs. McCord executed the will.

Heinrich and James McCord, the two living children disinherited in the will, testified as well. Heinrich testified that Mrs. McCord was unable to identify people, that she failed to recognize her own family and even confused the death of her son for that of Heinrich's uncle.  Heinrich also testified that Mrs. McCord was illiterate and had only a third-grade education, and therefore could not have read or understood the will.  Heinrich asserted that Mrs. McCord could not carry on an intelligent conversation. Finally, Heinrich testified that the two disinherited brothers, James McCord and the deceased Samuel McCord, had been the "light" of her mother's life and that nothing could have alienated her love or given her reason to disfavor any of her children.  James McCord substantiated much of Heinrich's testimony.  He noted that Mrs. McCord had no knowledge about her finances nor any ability to manage them.  James McCord asserted that Mrs. McCord was incapable of making a valid will: "She just had really no concept of reality, of people, place or time, what was real and what wasn't. . . . She would have signed anything you put in front of her."

Brooks then put on proof in rebuttal.  Brooks introduced into evidence the deposition of Dr. Montgomery, in part to explain Dr. Montgomery's signature on the statement that, on or about April 25, 1991, Mrs. McCord was incapable of making a valid will.  The record reveals that the statement had been pre-typed and sent to Dr. Montgomery by Heinrich's counsel prior to Dr. Montgomery's deposition.  The statement read: "When I observed Ollie McCord on or about April 25, 1991 in my opinion she _____ was _____ was not competent to intelligently dispose of her property."   Dr. Montgomery had placed a check in the blank indicating that Mrs. McCord was not competent to dispose of her property.  Beneath the statement, Dr. Montgomery handwrote and signed an additional note:  "A full competency or mini mental status exam was not done but the patient in the notes was documented to be confused so we could not say she was competent unless extensive testing had been done.  Extensive testing was not done."

In her deposition, Dr. Montgomery explained the document.  She said that she had no way of knowing whether Mrs. McCord was competent to execute her will on July 19, 1991, both because she had not tested to measure Mrs. McCord's mental capacity and because she had not observed Mrs. McCord on the date of the will's execution.  Observation would have been necessary on the date of the will's execution because dementia patients "have good days and bad days and their orientation will fluctuate." Dr. Montgomery testified further: "You really have to see how the patient is doing, really the day that they might make such a decision; but it can vary quite a bit.  Some days they will recognize their families and other days they won't . . . ."  Dr. Montgomery testified that Mrs. McCord's mental status was prone to fluctuation. Dr. Montgomery apparently felt that the pre-typed statement forced her to choose definitively whether Mrs. McCord was or was not competent to execute her will.  Consequently, Dr. Montgomery testified, "If I had to choose, I would not be able to say that she was competent, and that's what I was trying to paraphrase in my note."

Jacqueline Denton ("Denton"), a registered nurse at McKendree Manor who took care of Mrs. McCord daily, testified about Mrs. McCord's competency:

> She was very alert to herself. She recognized people. She knew my name. She knew when she had a problem. She told them to come and get me. She could tell me exactly what was wrong with her. And she would also tell me if she wanted me to call one of her daughters, and she would name them by name.

Denton said that there was no doubt in her mind that Mrs. McCord knew what she was doing on July 19, 1991.

Denton also testified about the nurses' notes to which Dr. Smith referred in his testimony. First, she explained that the absence of any nurses' notes from June 26, 1991 through July 24, 1991 indicated that there were no problems with Mrs. McCord during that time period. She said that it was not unusual for there to be blocks of time with no nurses' notes, because notes were made only on days when problems with the patient occurred. Denton also discussed the numerous notations alluding to Mrs. McCord's confusion:

> Confused could just mean in one sphere. It could mean that you don't know what time of day it is. It could mean you don't know where you are. It can mean you don't know who you are. It can mean you don't know who your visitors are. It could mean a lot of things. . . . [Mrs. McCord] was not confused as to who she was, who her family was, who the staff was, and where her room was.

She also testified that Mrs. McCord's confusion was often the result of other medical problems affecting her blood sugar levels, and that the notes indicating confusion could be because some of the notes were made soon after Mrs. McCord awoke.

Finally, Denton addressed the medical record written by Dr. Montgomery which stated that Mrs. McCord was unable to give a medical history due to her dementia. Denton suggested that, on that day, Mrs. McCord's mental state may not have been due to dementia, but rather the result of the nausea and vomiting experienced by Mrs. McCord prior to the diagnosis, which affected her blood sugar levels. Denton testified that, once Dr. Montgomery treated Mrs. McCord for the nausea and vomiting, Mrs. McCord's blood sugars improved. Within two to three weeks, she became less confused and more oriented.

Finally, Brooks testified. Brooks testified that Heinrich, the will contestant, had been supported by her parents throughout her life, and that Heinrich continued to live in a house that Mrs. McCord and their father had purchased. Brooks testified that James McCord, the other living disinherited sibling, had borrowed money from Mrs. McCord and lived in her home before leaving her with unpaid utility and phone bills. Neither Heinrich nor James McCord offered support to Mrs.

McCord. Brooks testified that at least one of the three remaining sisters, the named beneficiaries in the will, visited Mrs. McCord at McKendree Manor almost daily, and that they all spent special occasions together. Mrs. McCord recognized them. As to the preparation and execution of the will, Brooks testified that her only involvement was to contact a lawyer at Mrs. McCord's request.

At the close of proof, the trial court issued an oral ruling. The trial court held: "The will was executed as required, and I believe now very firmly that Ollie McCord knew the force and consequences of her acts in making the will on July the 19th of 1991." The trial court entered an "Order of Probate" consistent with the oral ruling on September 26, 2002. On October 25, 2002, Heinrich filed a "Motion to Alter Judgment," which the trial court denied on December 23, 2002. From that order, Heinrich now appeals.

On appeal, Heinrich argues that the proof shows that Mrs. McCord lacked the capacity to execute the will, and that the will was the product of undue influence. At trial, counsel for Heinrich stated expressly that the case would be tried only on the issue of capacity, and consequently no finding was made on the issue of undue influence. Under these circumstances, the issue of undue influence will not be considered in this appeal, and Mrs. McCord's capacity to make a will is the sole issue on appeal.

Because this case was tried without a jury, the trial court's legal conclusions are reviewed *de novo* with no presumption of correctness. ***Campbell v. Fla. Steel Corp.***, 919 S.W.2d 26, 35 (Tenn. 1996). However, the trial court's factual findings are accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); ***The Bank/First Citizens Bank v. Citizens & Assocs.***, 82 S.W.3d 259, 262 (Tenn. 2002). When a credibility determination must be made to resolve the issues, the weight, faith and credit given the witnesses by the trial court is given considerable deference, as the trial court has the opportunity to directly observe the witnesses' demeanor and appearance while testifying. ***McCaleb v. Saturn Corp.***, 910 S.W.2d 412, 415 (Tenn. 1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997).

In a will contest, the proponent bears the burden of proving the will's valid execution in accordance with the legal requirements. ***In re Estate of Maddox***, 60 S.W.3d 84, 88 (Tenn. Ct. App. 2001). Once this burden has been met, the burden shifts to the contesting party to prove that the testator lacked testamentary capacity to execute a valid will. ***See id.; Harper v. Watkins***, 670 S.W.2d 611, 629 (Tenn. Ct. App. 1984) (quoting ***Taliaferro v. Green***, 622 S.W.2d 829, 837 (Tenn. Ct. App. 1981) (" 'The rules of burden of proof with regard to testamentary capacity are substantially similar to those with regard to undue influence.' "). If the contestant puts on proof of lack of capacity, the proponent of the will must come forward with evidence that the decedent had the capacity to execute the will. ***Harper v. Watkins***, 670 S.W.2d 611, 630 (Tenn. Ct. App. 1984) (quoting ***Taliaferro v. Green***, 622 S.W.2d 829, 837 (Tenn. Ct. App. 1981)).

The capacity to make a will is the comprehension of "the property being disposed of, the manner of its distribution, and the persons receiving it." ***Brewington v. Sanders***, No. 01A-01-9301-

CV-00002, 1994 WL 189626, at *4 (Tenn. Ct. App. May 18, 1994) (citing *Goodall v. Crawford*, 611 S.W.2d 602, 605 (Tenn. Ct. App.1980); *McCormack v. Riley*, 576 S.W.2d 358, 361 (Tenn. Ct. App. 1978)). In addition, one "must also be capable of knowing and understanding the effects and consequences of his or her actions." *Id.* (citing *In re Estate of Elam*, 738 S.W.2d 169, 171 (Tenn. 1987); *Am. Trust & Banking Co. v. Williams*, 225 S.W.2d 79, 83 (Tenn. Ct. App. 1948)). The testator's capacity to execute a valid will need only exist at the time of the will's execution. Thus, the testator's mental condition " '*at the very time of executing the will is the only point of inquiry*; but evidence of mental condition both before and after making the will, if not too remote in point of time, may be received as bearing upon that question.' " *Harper v. Watkins*, 670 S.W.2d 611, 628-29 (Tenn. Ct. App. 1984) (quoting *Am. Trust & Banking Co. v. Williams*, 225 S.W.2d 79, 83-84 (Tenn. Ct. App. 1948)).

On appeal, Heinrich argues that the preponderance of the evidence submitted at trial shows that Mrs. McCord was incompetent at the time that her will was executed. Heinrich relies on Dr. Smith's testimony that his 1987 "mini-mental exam" of Mrs. McCord revealed she could not have had testamentary capacity in 1991 due to her progressive dementia.

Despite the fact that Dr. Smith's last examination of Mrs. McCord was four years prior to the execution of her will, it is relevant in light of his opinion that her mental condition would not have improved over time, but rather would have worsened. Dr. Smith also found support for his opinion in records and statements by medical professionals made in the years after his 1987 examination of Mrs. McCord.

The trial court, however, apparently credited the ample testimony establishing Mrs. McCord's capacity on the date in question, July 19, 1991. The medical professionals who treated Mrs. McCord during her stay at McKendree Manor asserted that her mental capacity fluctuated, and explained that the medical records merely reflected that fluctuation. They testified that, at most times, Mrs. McCord was sufficiently oriented to have the capacity to make a valid will. This is in contrast to the testimony by the disinherited siblings, Heinrich and James McCord, blanketly asserting that at no time did Mrs. McCord have sufficient testamentary capacity. Finally, the legal professionals, Parsons and the two witnesses, testified about the careful measures taken to ensure that Mrs. McCord had testamentary capacity and that her will reflected her wishes. Viewed overall, the trial court had ample reason to credit the testimony establishing that, on July 19, 1991, Mrs. McCord had the capacity to execute a valid will. Giving due deference to the determinations of credibility by the trial court, and in light of the preponderance of the evidence as a whole, we find no error in the conclusions of the trial court, and in the admission of the will into probate.

The decision of the trial court is affirmed. Costs are taxed against Plaintiff/Appellant JoAnn Heinrich and her surety, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE