FILED

05/05/2017

Clerk of the
Appellate Courts



## IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### March 21, 2017 Session

## IN RE: ESTATE OF LAURA COPELAND FARMER

**Direct Appeal from the Probate Court for Wilson County**
**No. 2015PR1     John Thomas Gwin, Judge**

---

### No. M2016-01300-COA-R3-CV

---

This appeal arises from a will contest. The decedent-mother had four children but left the majority of her estate to one daughter. The three plaintiff-siblings allege that the defendant-daughter exercised undue influence over their mother to induce her to change her will before she died. In the midst of a bench trial, the trial court entered an involuntary dismissal *sua sponte* at the close of plaintiffs' proof. The trial court found that a confidential relationship existed between the decedent-mother and the defendant-daughter, but the court also found by clear and convincing evidence that the mother was not influenced in the execution of her will. For the following reasons, we vacate the dismissal and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Probate Court Vacated and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY ARMSTRONG, J., joined.

Charles Stephen Michels, II, and David J. Callahan, III, Nashville, Tennessee, for the appellants, Gary Wayne Farmer, Rita Gail Reed, and Roger Farmer.

Larry Leonard Roberts and John S. Roberts, Nashville, Tennesssee, for the appellee, Sharon Farmer Lovett.

### OPINION

### I. FACTS & PROCEDURAL HISTORY

Laura Copeland Farmer ("Mother") resided in Mount Juliet, Tennessee, with her husband Marvin Farmer ("Father"). Mother and Father had four children – Gary, Rita,

Roger, and Sharon.[1]  In 2010, when Mother was 83 years old, Father died, and Mother underwent triple bypass surgery.  Thereafter, Mother began residing with her daughter Sharon, who lived nearby, for weeks at a time.  Sharon's relationship with her siblings deteriorated.  In November 2013, at the age of 86, Mother revoked her prior will, which had named all four children as beneficiaries, and executed a new will leaving the majority of her estate to Sharon.  Mother died in 2014 at the age of 87.

Shortly after Mother's death, Sharon filed a petition for probate of Mother's estate and offered the November 2013 will for probate.  When Gary, Rita, and Roger discovered the existence of the 2013 will leaving the majority of Mother's estate to Sharon, they filed a complaint to contest the will.  Gary, Rita, and Roger (collectively, "Plaintiffs") alleged that they had been denied access to their mother by Sharon through her direct refusal to allow them to visit and her "elaborate lies and schemes to drive the family apart."  Plaintiffs alleged that Sharon "concoct[ed] stories and rumors of wrongdoing done by the other children to cause [Mother] to suspect them and drive them out of her life, and eventually, [her] Will."  They alleged that Mother "was so caught up in [Sharon's] falsehoods" that she would not even allow them to enter her house toward the end of her life.  Plaintiffs alleged that Sharon held power of attorney over Mother, controlled physical access to her, and used Mother's funds for her own personal use.  They alleged that Sharon was the dominant party in the relationship and used "fear, falsehoods, and control" to unduly influence Mother and procure the execution of the 2013 will.[2]

The trial court entered an order opening the estate for probate and an order certifying the will contest.  The will contest was heard over the course of three days in March 2016.  Sharon, the defendant-daughter, testified that Mother lived with her part-time for the last few years of Mother's life.  Mother lost her husband in June 2010, and she underwent triple bypass surgery in November 2010.  Sharon and her husband lived seven to eight minutes away from Mother's home.  Sharon testified that Mother lived with her for weeks at a time and overall spent approximately half of her time at each residence.  Sharon's husband cooked for Mother almost every night she stayed at their home.  On the days when Mother stayed at her own home, Sharon's husband would stop by her house on the way home from work to check on her.  Sharon's husband and daughter both testified that Mother was strong-willed.

Sharon testified that she picked up Mother's prescriptions and dispensed Mother's medications for her each week, as Mother took eight to ten pills every day.  Mother was diagnosed with pulmonary fibrosis in 2011 and also used oxygen every day.  Sharon

---

[1]For clarity, we will refer to the parties in this case by their first names.  No disrespect is intended.
[2]Plaintiffs' complaint also alleged a lack of testamentary capacity and intent.  However, they did not pursue this theory at trial and instead relied on the allegation of undue influence.

sometimes scheduled Mother's doctor's appointments and arranged for Mother's doctors to call her rather than Mother if there was an issue with testing or other matters. Sharon testified that Mother could drive until the last year or two of her life but acknowledged that she (or her daughter) always drove Mother to her doctor's appointments and also accompanied Mother when she saw the doctor.

Sharon also drove Mother on every occasion that she went to her attorney's office. However, Sharon remained in the lobby or sat on the porch while Mother met with the attorney. Sharon sometimes paid the attorney's invoice from Mother's account before leaving if Mother's hand was hurting from arthritis or if Mother simply asked her to do so. Mother executed a document legally granting Sharon power of attorney in 2011. However, Sharon conceded at trial that Mother believed that she possessed power of attorney even before then, and Sharon did not tell Mother otherwise. Sharon said, "in my mom's mind, I was the power of attorney."

Sharon drove Mother to the attorney's office in November 2013 when Mother revoked her prior will and executed a new one. Sharon testified that she did not know at the time that Mother executed a new will and that she never discussed the will with Mother thereafter. Sharon's husband similarly testified that he never spoke with Mother about her will, although he acknowledged that Mother mentioned that she needed to make a will and that he told her to contact her attorney. Sharon's adult daughter testified that she knew Mother had made a will but that she did not have any input regarding its creation.

Sharon was asked whether she had ever filed for bankruptcy and responded that she had in the 1970s or '80s. However, Plaintiffs subsequently introduced records indicating that Sharon was also in bankruptcy from 1999 to 2006. Sharon and her husband both testified that Mother was able to manage her own finances. By April of 2011, however, the statements for Mother's bank accounts were mailed directly to Sharon's home rather than Mother's home. Sharon testified that the address change was made because Mother's bank statements were missing from her mailbox for several months in a row. Regardless of where Mother was staying at the time, Sharon's husband also picked up Mother's remaining mail nearly every day from Mother's mailbox.

Sharon's name was also listed on Mother's bank accounts. She testified that she sometimes signed Mother's checks because Mother had arthritis in her hands. Sharon estimated that she wrote 50 to 75 checks on Mother's checking account over the years. Sharon initially testified that she had never written any checks to herself from Mother's account but later said she did so only at Mother's direction.

A certified document examiner, Jane Eakes, also testified at trial. She examined

numerous checks and documents from Mother's bank accounts and concluded that 278 checks were signed by someone other than Mother between 2010 and 2013. Sharon was asked about many of these checks at trial. She denied most of the findings by Ms. Eakes and insisted that the disputed checks were actually signed by Mother, even though Sharon admitted to completing the top part of the checks. Many of the checks that were purportedly signed by Mother were made payable to Sharon or her husband with the notation "Loan" on the memo line. These checks with "Loan" notations totaled around $15,000. Sharon testified that she repaid Mother for all of these loans.[3] When asked for proof, she said that she paid the loans back in cash and that the repayments would not be reflected as deposits on Mother's bank statements because Mother would always put the money in her wallet or drawer or Bible. During her deposition, Sharon was asked if Mother would immediately deposit cash or keep it "laying around the house," and Sharon responded that she would deposit it except for about $200 in spending money.

Many other checks from Mother's account were made payable directly to Sharon or her husband without any notation regarding the reason for the check. Ms. Eakes concluded that Sharon also signed Mother's name on these checks, payable either to Sharon or her husband, which totaled over $20,000. Sharon denied signing the checks and insisted that she completed the top part of the checks while Mother signed them. Sharon testified that some of these checks were basically gifts from Mother because of everything she and her husband did for Mother.

Checks were also written from Mother's account for new appliances that were delivered to Sharon's house. Sharon testified that Mother wrote these checks, for the purchase of a dishwasher, range, microwave, and end tables, but she insisted that she repaid Mother in cash. More checks were written from Mother's account for new windows for Sharon's home, at a total cost of over $5,000. Sharon testified that Mother bought the windows for her as a gift. Again, she disputed Ms. Eakes's conclusion that Sharon had signed the checks herself.

Sharon also admitted to using Mother's Bank of America credit card. Sharon insisted that she was added as an "an authorized signer" on the account, but the records subpoenaed from Bank of America made no mention of Sharon having such authority. Sharon testified that she always paid for her portion of the charges on the credit card bill every month. She also testified, initially, that Mother always paid her own portion of the bill in full every month and never let a bill remain outstanding. However, when asked about credit card statements indicating that the Bank of America card had a $5,000 balance after Mother died, she claimed that Mother only paid her bills in full *most* of the time. Sharon testified that she offered to continue paying the bill after Mother died but

---

[3]Sharon's husband testified that they repaid the loans from Mother "[a]s much as we could."

that Bank of America forgave the balance when it was notified of Mother's death.

Sharon denied that she ever tried to keep Mother from her other three children – Gary, Rita, and Roger. She testified that nothing prevented Plaintiffs from visiting with Mother either at Mother's own home or at Sharon's home while Sharon and her husband worked during the day. Sharon and her husband both insisted that Plaintiffs were welcome to visit Mother at their home anytime.

Each of Sharon's siblings also testified. The oldest child was Gary. He also resided in Mount Juliet and was retired. Gary testified that he and Father did not speak for a period of about eleven years due to an argument they had around 1994.[4] Still, Gary testified that he maintained a good relationship with Mother despite his dispute with Father. He testified that he still talked to Mother quite often and visited with her occasionally either at his house or at Mother's house when he knew Father was not home. Gary testified that when he found out Father was in poor health, he swallowed his pride and went to see him, and the two reconciled (apparently around 2007). Gary said that he and Father had a good relationship and spent quite a bit of time together thereafter, and Father still wanted him to be the executor of his will.[5] Gary testified that he and Father were both competition shooters in the past and that Father gave him two pistols and a sword from his service in World War II before he died.

Gary testified that his relationship with Mother was very good after Father died and that he spent time with her regularly, as Father had asked Gary to take care of Mother. However, he testified that his relationship with Sharon began to deteriorate after Mother's heart surgery. Gary said that Sharon became convinced that his wife was trying to put Mother in a nursing home. Gary's wife was a nurse at the hospital where Mother had open heart surgery. Gary testified that his wife was discussing Mother's rehabilitation with her surgeon and that Sharon became "livid" and threatened to call Mother's lawyer to stop him and his wife from interfering with Mother's care. Thereafter, Mother made statements to Gary and to his brother Roger indicating her belief that Gary's wife wanted to put her in a nursing home. Gary said that Mother would not have a pleasant conversation with his wife thereafter.

Gary said that his feelings toward Sharon began to change when she started "changing and trying to control" Mother. Gary explained that he took Mother to a post-operative doctor's appointment in 2010, at Mother's request, and that Sharon showed up

---

[4]The 1994 dispute between Gary and Father occurred at a local gun club. According to Gary, Father confronted him and threatened him when he showed up at the club with Japanese co-workers, as Father was a veteran of World War II and did not approve of his associations.

[5]Father's will left everything to Mother unless she predeceased him, in which case the estate was to be divided equally among the four children.

uninvited and insisted that she had to be present for the appointment because she was "the POA." (At that point in time, Sharon was not actually the power of attorney for Mother, as Mother did not execute the power of attorney until May 2011. However, Mother apparently believed that Sharon was the power of attorney.) Gary testified that he offered to take Mother to other appointments but Mother would respond, "No, I can't. I have to let Sharon do that."

According to Gary, when he visited Mother, either Sharon or her husband would follow them from room to room or outside and would not permit them to talk alone. Eventually, Sharon began to accuse Gary of stealing things from Mother. Gary testified that Sharon accused him of stealing a gun that Sharon claimed Father promised to her. However, the gun was found in Mother's gun safe after she died, and it was listed in the inventory of Mother's property filed with the court. Gary testified that he never had a key to Mother's house and did not have access to her safe.

Gary said that it became difficult for him to see Mother in later years because he could not reach Mother by phone, and when he stopped by Mother's house, sometimes he was able to see Mother and sometimes he was not. He explained that Mother sometimes refused to answer the door. He testified that he would see Mother inside the house and call her, but she still would not answer. He said that sometimes Mother would come to the door but say, "What do you want? I can't let you in." Other times Mother would say "if you come in, you can't go in the basement" (which was where the gun safe was located).

Gary testified that Mother complained to him a couple of times in 2012 and 2013 about not having enough money, which he found odd because of the extent of the assets Father left for her. Gary testified that Mother wanted to have a garage sale to raise money. He believed that Mother did not know how much money she really had. Gary said Mother told him numerous times over the years, as late as 2013, that she had four children and that everything she owned was to be sold, with the proceeds being split four ways among them. He said she would always hold up four fingers as she said this. Gary believed that Sharon heavily influenced Mother in connection with her November 2013 will. He agreed that Mother was strong-willed and forceful but also said that she could be influenced, and "if she got something in her mind, she would keep it that way."

Pursuant to the November 2013 will, Gary received $4,000 from Mother's estate and "any guns currently in his possession." Mother also gave her attorney handwritten letters to her children to be opened after her death. The letter to Gary was written in May 2014, just a few months before she died in December 2014. It stated that she and Father loved Gary very much and that Gary grew up to be a fine man, but that he "forgot all the things that mean so much." Mother's letter to Gary acknowledged that "[Father] was

very hard on you" but suggested that Gary forgot the things Father did for him. The letter stated that Gary "stayed away for fifteen years + called twice" then "came around [to] see what you could get from him" when Father got sick. Mother continued,

> Even the [gun] club men thought you should have ma[d]e up and let by gones be gone. <u>But you didn't</u>. Now it's too late.
> Well Gary I'm gone too. You should have come to see me I have been pretty sick.
> I have one thing to say. It's in the Bible. Honor thy Father + thy Mother. But Gary you forgot that. Good Luck Gary and God Bless You and your family.
>
> Love You,<br>Mother

Gary testified that he was confused by this letter because he did visit Mother in the years before she died and made even more attempts to visit her but was unsuccessful. He also noted that during the period that he and Father were not speaking, he still maintained contact with Mother, so he believed her comment about staying away fifteen years and calling twice was factually untrue.[6] Gary was also surprised by Mother's suggestion that he came around before Father died to "see what [he] could get" because he did not ask for anything from Mother or Father. He said her comment "just didn't seem to fit."

Mother's younger daughter, Rita, testified as well. She resided in Murfreesboro. Rita testified that she always had a good relationship with Father, but she acknowledged getting into a physical altercation with Sharon before Father died. Rita said that Sharon told her on numerous occasions that Mother only had one daughter, referring to herself. Rita described one occasion when she was visiting with Father and talking with him on the couch, and Sharon approached Mother, who was standing nearby, and whispered in her ear. Mother then said to Rita, "You need to speak louder where I can hear. You're sucking up to the wrong person. I am going to outlive him." Rita testified that Sharon started laughing.

According to Rita, Sharon told her quite frequently that "everything in regards to Mom had to be cleared with her, because she was the power of attorney." Rita confirmed that Sharon "became infuriated" when Gary's wife suggested a rehabilitation center for Mother after her surgery. According to Rita, Sharon said that Gary's wife was interfering

---

[6]Rita also testified that the statement about Gary only calling twice in 15 years was untrue. She testified that Mother was always excited when she talked to Gary and would tell Rita when they had talked. Sharon's adult daughter similarly testified that Mother (her grandmother) was always happy to see Gary and that she was not aware of any animosity between them. However, she also said the years he did not come around broke Mother's heart.

7

in her area as the power of attorney and that if she did not stay out of Sharon's business, Sharon would get a restraining order against her. Rita testified that she offered to take Mother to doctor's appointments many times and that Sharon always declined her offers. Rita testified that she also invited Mother to come to her home on numerous occasions, and Mother indicated a desire to go, but Sharon insisted that Rita did not know how to administer Mother's medication, take care of her oxygen, and meet Mother's dietary needs due to her diabetes.

Rita testified that she visited Mother at Sharon's house but that it was very uncomfortable because Sharon and her husband would not allow her to have any private time with Mother and listened to their conversations. She testified that on one occasion she took Mother to play bingo after Father died, and Mother told her that Sharon had instructed their brother Roger to meet them there and listen to their conversations. Rita also testified that Mother made comments to her about not knowing how much money she had and her need to have a yard sale.

Rita said that Sharon accused her of stealing various things over the years, including Sharon's husband's wedding ring. Sharon also accused Rita of taking out a loan in Sharon's husband's name and opening a Macy's credit card in Mother's name. Rita denied all of these accusations.

Rita testified that she often tried calling Mother at Mother's house and at Sharon's house to no avail. Sharon and her husband testified that Rita called Mother multiple times a day at their house. On June 22, 2012, Mother's attorney sent the following letter to Rita:

> I have recently been contacted by your mother, Laura Farmer. She informs me that you have been calling her multiple times per day and leaving voice mails. She views this as harassment. She asked me to write you to request that you cease and desist immediately. She tells me that she has your telephone number and your address and that if she wishes to communicate with you, she will certainly call or write.
> **Ms. Farmer would like for you to please stop calling her**. She does not desire to take this matter to the next level and ask the Court for a Restraining Order, nor does she want to file criminal charges against her own daughter for harassment.
> I spoke with Ms. Farmer directly and not your sister, Sharon. These are her wishes and she would like for you to respect those wishes. I will not be sending you a second letter with this same request, civil demeanor or polite tone.
> If you continue to call Ms. Farmer in the same harassing manner and

contrary to her wishes, then I will advise her to act accordingly, which may involve legal actions against you. **Please do as your mother asks. Cease and desist immediately and refrain from further contact until she contacts you**.

Rita found it very strange that Mother's attorney included the remark about Sharon.

On June 28, 2012, Rita wrote a response to Mother's attorney insisting that he was only getting one side of the story. Rita claimed that she was only calling Mother once a day in the hopes of reaching her to talk or meet for lunch. She wrote that her family was being manipulated and destroyed "for monetary reasons." She claimed that Mother had been "manipulated into believing that her children were stealing from her" and that she and her brothers had been unable "to get anywhere near our mother since our father died" because of the lies being told to cause distrust and ill feelings. She wrote, "[Mother] has been convinced she cannot live on her own . . . and she has been taken away from me and my other siblings since my father passed away two years ago by numerous stories consisting of little to no truth whatsoever so that she will be solely dependent on [Sharon]." Rita ended by stating, "You can [] rest assured that this will be the last time you or Ms. Farmer (my mother) will hear from me and I hope I can expect the same from you."

Rita testified that in spite of the letters with Mother's attorney, nothing actually changed between her and Mother -- she continued to talk to Mother and visited her several times "when it was allowed." According to Rita, Sharon told her that she could only visit Mother at her house if she or her husband was at home, not while they were at work. She said that a couple of times she went to Sharon's house to try to find Mother and found Mother's vehicle parked in the backyard behind a fence as if it was hidden. Rita testified that she was "not allowed" to see Mother on birthdays or special occasions because Sharon would make up stories that they were out of town when they were not, and Rita saw them in town together. Rita testified that she left gifts at the door and that Mother said she never received them. Rita said she frequently drove to Mother's house in an attempt to see her there. She said that she could sometimes see movement inside the house, and on a few occasions Mother came to the door crying and said that she was not allowed to let Rita inside, as she had been instructed that Rita might steal from her or ask her for money. Rita testified that Sharon eventually told her that if she or her brothers showed up at Mother's house, the neighbors had been instructed to call the police to report them for trespassing.

According to Rita, Mother told her she was afraid that Rita and her brothers were going to put her in a home and take all of her money for themselves. Rita testified that she and her siblings had never discussed putting Mother in a home and that Mother was

fearful based on "what she had been told we were going to do to her." Rita testified that Mother also indicated that she was afraid of Sharon. Rita said that she had heard Sharon's husband describe altercations between Mother and Sharon in which he had to physically separate them.

Rita was not aware of Mother's revised will prior to her death. Rita testified that Mother would always say, "I have four children. Everything I own will be divided amongst my four children." Mother's November 2013 will left $2,000 to Rita and stated, "This is the ONLY thing that I am bequeathing to Rita Gail because I have been very disappointed in her disrespectful actions and attitude toward me since the passing of my husband and her father." Mother's handwritten letter to Rita stated that Father "thought a lot of you" and "would rock you a lot. But sometimes you would stray." She also noted in her letter that she left Rita "a little something; it's not much." Rita believed that Sharon unduly influenced Mother by turning her against the other three children for Sharon's own personal gain.

Roger was the final sibling to testify. He said that he initially had a really good relationship with Sharon after Father passed away. He confirmed that Sharon asked him to follow Rita and Mother to bingo in order to basically "be a watchdog" and listen to their conversations. Roger testified that Sharon had also instructed him to lie to Rita and Gary and tell them that Mother was out of town so that they would not come to birthday celebrations or other events. He said Sharon instructed him not to share information with Rita about what was going on with Mother. Roger said Sharon made similar requests on other occasions, directing him to be sure he "kept an eye on" Rita if she came to visit. He said Sharon would generally say that Rita had stolen from her and that she would also steal from Mother. He said Sharon also told Mother that Rita would take things. Roger also overheard Sharon tell Mother that she should put away certain things that were in the house because Gary would come and take them. Roger testified that he also heard Sharon's husband tell Mother on more than one occasion that if she made a new will, she should include a provision stating that if anyone contested it they would get nothing.

Roger said he had observed altercations between Sharon and Mother more times than he could count. He saw Mother slap Sharon during one altercation. He claimed he had heard Sharon threaten Mother and say, "I have to tell you how much money you can spend." Roger testified that Sharon balanced Mother's checkbook because Father had balanced it in the past and Mother could not understand how to do it after he died. He had also observed Sharon writing checks from Mother's checkbook.

Roger said that an odd thing happened on his birthday in January 2011. He testified that Mother always gave her children and grandchildren a birthday card with $5 on their birthdays, even into adulthood. On this birthday, however, Roger visited Mother

10

at Sharon's house, and Mother handed him a card with a check for $1,000. He made a comment about the strangeness of the situation, and Sharon said, "Well, I told Mom that you needed to have a thousand dollar check." Mother's bank records revealed that a $1,000 check was also written to Sharon's husband shortly thereafter with a notation that it was for his birthday. The handwriting expert identified this as one of the checks on which Sharon wrote Mother's signature.

Roger testified that he did maintenance and repair work at Mother's house after Father passed away and that Mother gave him a garage door opener and key to her house.[7] However, Mother said, "Whatever you do, don't tell Sharon I gave you a key." Roger said that Mother often made similar statements if she confided in him about anything, adding, "Do not tell Sharon."

Roger testified that he went with Mother to a post-operative doctor's appointment at the hospital and that Sharon showed up unexpectedly. He asked why she was there, and she insisted that she needed to be there because she was "the POA." Roger said Sharon insisted that she was the only one who could fill out Mother's paperwork and accompany her in the room with the doctor. According to Roger, Mother then insisted that he could go in with her to see the doctor, so he and Sharon both accompanied Mother when she saw the doctor. Roger testified that the doctor told Mother that she had recovered well from her surgery and could start driving and caring for herself again. However, after the appointment, he overheard Sharon tell Mother that the doctor had said that she could *not* return home. When Roger interrupted and said that was not true, Sharon became really upset. Roger believed Sharon feared losing control of Mother. He said Sharon told him that she needed to "keep an eye" on Mother and did not want Rita or Gary coming around to talk to Mother.

Roger testified that home health care givers stayed with Mother about twelve hours per day and arrived hours before Mother woke in the mornings, around the time Sharon left for work. Roger said he questioned the justification for having Mother spend so much money on home health care, and Sharon responded, "I'm making sure that no one comes to see Mom."

Roger testified that Mother asked him to assist her in completing an inventory of the guns that remained in Father's gun safe after he died. He said that Mother opened the safe because he did not know the combination, and the safe only contained guns. He

---

[7]Several other checks from Mother's account were written to Roger during this general timeframe for small amounts such as $33, $42, $46 and $48. Roger testified that he was performing maintenance projects at Mother's house and that Mother reimbursed him for various receipts from Lowe's and other stores. One check to Roger was for $100 with a notation for "gutter cleaning." Sharon confirmed during her testimony that Roger was often "up there doing stuff around [Mother's] house."

testified that he and Mother labeled and inventoried the guns and returned everything to the safe. The next day, Sharon called Roger and asked him if he found $3,000 in cash in the safe. Roger said there was no money in the safe, but Sharon insisted that there was. Roger testified that Sharon was really mad at him and at Mother because they accessed the gun safe "without her authority." He said Sharon insisted that because she was "the POA," she should have been present during the inventory.

Roger testified that any time he took Mother to run errands, she always wanted to stop by the bank to ask for a bank statement. He testified that in late January 2011, Mother asked him to take her to the bank, and he did so without knowing why they were going. He testified that Mother sat down with a lady at the bank and talked to her about something she wanted to do. During this meeting, Mother signed the documents necessary to close a $40,000 certificate of deposit that had previously listed as the account owners Mother, Roger, and Sharon. The account documents provided that only one signature was required for withdrawal. Mother closed this CD and put the money solely in Roger's name. Roger testified that this money was for his son's golf tour and that Father had always wanted to sponsor him. Roger testified that when Mother completed the transaction, she said, "Whatever you do, do not tell Sharon. Sharon will get mad at me for doing this."

When Mother's bank statement arrived in the mail, Sharon discovered the transfer of the $40,000 CD. According to Roger, Sharon called him screaming and accused him of taking Mother's money. He said he tried to explain that he did not take the money and that Mother asked him to take her to the bank and was nice enough to give him the CD. Sharon stated in a text message that Mother did not remember what occurred. Shortly thereafter, Roger wrote letters jointly addressed to Mother and Sharon in an effort to address various issues, including the CD. He stated in the letter that Sharon's disposition toward him had begun to change when he supported Mother in her desire to return to her own home after surgery. He wrote, "This is when our relationship started to change and I finally figured it out. It was because Sharon was going to lose control of Mother's every move, she couldn't keep Gary or Rita away and now she was starting to do the same things to me that she had done to them." Roger suggested in his letter that Mother was a sound and intelligent individual and capable of making her own decisions but that Sharon was keeping Mother at her house so that no one could see her and so that Sharon could manipulate her decisions. He wrote in the letter that Sharon was accusing her siblings of wrongdoing in order to brainwash Mother into thinking they were out to take everything she owned. He noted Sharon's most recent accusation that he had scammed Mother out of a large sum of money. He wrote that he was concerned with Sharon's motives and suggested that Sharon did not have Mother's best interest at heart when it came to what Mother wanted to do. He questioned Sharon acting as power of attorney and suggested that a power of attorney should not use his or her position as leverage against other

12

siblings. He requested either the removal of Sharon as power of attorney or the addition of another sibling as secondary power of attorney to avoid further conflicts.

Roger's letter was written on May 2, 2011. On May 27, 2011, Mother executed the document appointing Sharon as her power of attorney. As noted above, prior to that date, Sharon did not actually have power of attorney, but Mother believed that she did and Sharon had never informed her otherwise. Around this time, the locks were changed on Mother's house so that Roger no longer had access to it.

Roger testified that he went to see Mother at Sharon's house around this time, and Mother came outside and apologized and said that she could not let him inside. He said a home health care worker was also present and said, "I've been instructed by Sharon that you cannot come into the house." Roger said he proceeded to talk with Mother on the porch, and the home health care worker sat beside them. He questioned her about this, and the home health care worker said that Sharon had instructed her to remain present and "monitor" Mother if Roger, Rita, or Gary came to visit.

Roger testified that Mother also started distancing herself from him. He testified that Sharon falsely told Mother that he had removed things from Mother's house and her safe when he had been at Mother's home performing work. He testified that he only had one gun from Mother's home, and that was a pistol that Father gave to him before he died. He testified that he never took anything out of the safe and that he did not even know the combination.

Roger described instances when he tried to visit Mother at her own house, and she would not answer the door or her phone even though he could hear Mother walking around inside. He said that on one occasion when he tried to visit Mother at her house, she opened the blinds and stood there with tears running down her face saying that she could not let him in because she would "get in trouble" with Sharon. Roger testified that Sharon eventually told him that she had instructed Mother's neighbors to call the police if he, Rita, or Gary pulled into Mother's driveway.

Like his other siblings, Roger was unaware of Mother's 2013 will until she died. He also testified, like Rita and Gary, that Mother had always told him that she intended to divide her estate equally between the four children. In Mother's November 2013 will, she left Roger "any guns currently in his possession" but nothing else. The will, which was drafted by Mother's attorney, stated, "Since I have already gifted him the certificate of deposit, I do not desire that he should receive any other funds from my estate." The will further provided, "The reason I am not including my son, Roger Farmer, in this my Last Will and Testament is because I have previously gifted to him a large sum of money, which is his inheritance." The handwritten letter from Mother to Roger stated:

I received your letter. My lawyer has it. The things you took out of the safe should be returned to me. It wasn't yours to take. That's call[ed] <u>stealing.</u> Your Father didn't [want] you to have anything . I don't see you because I don't want too. You hurt me pretty bad. I will be pas[sed] on by the time you get this letter.

You have gotten all you['re] getting from me or your father. If you contest this letter or will you get <u>nothing</u> anyway.

Love<br>Mother

Roger believed that the November 2013 will did not reflect Mother's true desire and that she was under pressure from Sharon.

Mother's attorney testified that he prepared the will in accordance with Mother's very specific instructions, and although Sharon drove Mother to the office, Sharon was not present and Mother had no prepared notes when he drafted the will. The attorney testified that he told Mother that "she could do what she wanted to with her property." The attorney testified that Mother "was under the impression" that Gary and Roger had taken some of the guns and that they were not all in the basement where she kept them in the gun safe. So, the attorney testified that Mother basically said, "whatever guns they have, they can keep them." Mother also told the attorney that Roger had taken her to the bank and had a certificate of deposit transferred into his name "against her wishes, and as far as she was concerned, that was his inheritance" and "all he was going to get" from her. He recalled Mother stating that Roger had taken her to the bank when she had just left the hospital or was medicated or something along those lines, and that he had her sign a CD over to his name when that was not what she wanted. The attorney testified that "[s]he was upset with Gary – not Gary so much, but Roger and – and Rita Gail, because she didn't appreciate the way that she felt like they acted toward her when their father, her husband, passed away." He said Mother expected that her children would be dismayed about the will and asked him to insert a provision that if any of her children contested the will, his or her bequest would be void. Mother was 86 years old when she made the will, but the attorney testified that he had no question as to her mental abilities or memory. Another attorney in the office, who witnessed Mother's will, also testified at trial. Mother also told her that Roger was able to take the money from her when she was on medication. Both attorneys described Mother as strong-willed.

The certificate of deposit had been transferred to Roger on January 31, 2011, and Mother's surgery was performed in November 2010. A medical record was introduced at trial indicating that Mother visited her doctor eight days before the certificate of deposit was transferred, and Mother reported to her doctor that she was feeling well and having no side effects from her medications. Sharon testified at trial that when the statement

14

arrived in the mail reflecting the transfer of the CD, Mother asked her "what it was for." Sharon testified that she and Mother had a discussion about the CD at that time. Sharon was asked at trial whether she (Sharon) had ever stated that Roger was able to obtain the CD because of mental infirmities of Mother. She responded, "My mom had got out of the hospital in December after her open-heart surgery . . . So she was recuperating at my house in January, when Roger took her, when I was at work." She implied that the medical record from that timeframe was not trustworthy because that particular doctor also treated Roger.

Sharon's daughter testified that she spoke with Mother (her grandmother) nearly every day and that Mother had told her about the transfer of the CD to Roger. According to Sharon's daughter, Mother "called him a name" and said that she did not realize until it was too late that the CD had been taken away from her. Rita testified that Sharon and Mother both discussed the CD with her as well. Rita testified that Sharon was the first to mention it and said that Roger had stolen money from Mother. Subsequently, Mother told Rita that she was very upset with Roger and that he had taken money away from her that was supposed to be for her future.

Roger testified that Mother never said anything to him during her lifetime indicating that she was upset about the transfer of the CD. He said the issue was never mentioned aside from in Mother's letter. Roger testified that Sharon was the only one who accused him of scamming Mother and taking her money.

Mother's November 2013 will left numerous specific devises to various other family members and left the remainder of the estate, including her home, to Sharon. Sharon's husband received $10,000 under the will, and Sharon's daughter received an IRA worth $27,000, furniture, two dolls, and all of Mother's jewelry. Mother also left $1,000 to her sister, $2,000 each to her grandson and four great-grandchildren, and $5,000 each to the National Rifle Association and the American Heart Association. Sharon stipulated that she received more under the 2013 will than she would have through intestacy. The record is not clear as to the value of the property Sharon actually received under the will. In Sharon's petition to probate the 2013 will, she estimated that Mother owned property worth roughly $625,000 at the time of her death in addition to two checking accounts. Plaintiffs' complaint alleged that Mother had "several hundred thousand dollars in her bank account" when she drafted the will in 2013, but no evidence was admitted at trial regarding the balance in the accounts at the time of her death. Gary testified that he did not believe that Mother was aware of how much money she really had because she left only $1,000 to her sister, and they were very close.

15

Mother's only living sister testified as well.[8] She testified that she and Mother talked on the phone nearly every day and that Mother told her that she had changed her will. She said Mother was not easily influenced and in general she made her own decisions. She said Mother did not let anyone boss her around, even Sharon. Mother's sister testified that she would be surprised to learn that Sharon signed checks for Mother and believed "she would not do that." She did not believe that Sharon would ever write checks out of Mother's account to herself or her husband.

Mother's sister testified that Mother called her crying quite a few times about Roger and Rita and that Mother "was terrified of them." However, she also testified that she and Mother discussed the CD that Roger received, and Mother told her that Roger "got $40,000 from his daddy to help out his son in the golf tournaments, and the daddy let him have it." Mother's sister understood that Roger "was given it" and said that Mother did not indicate "one way or another" whether she was pleased or displeased about the transaction.

At the close of Plaintiffs' proof, they moved the court to find the existence of a confidential relationship between Sharon and Mother and therefore shift the burden to Sharon to prove by clear and convincing evidence that the will was not the product of undue influence.[9] Plaintiffs pointed to the facts that Sharon held power of attorney for Mother, often lived with Mother, wrote checks from Mother's checking account, and utilized Mother's credit card, while Mother relied on Sharon for her health and financial needs. Plaintiffs also argued that Sharon turned Mother against them and convinced her after-the-fact that the transfer of the CD was accomplished by theft. However, Plaintiffs emphasized that they were only seeking to shift the burden of proof on the basis of a confidential relationship and not moving for judgment in their favor or seeking a ruling on "the case in full."

The trial court entered its written order on April 20, 2016. The trial court found that a confidential relationship did exist between Sharon and Mother. However, the court went on to find, by "at least clear and convincing proof, that this lady was not influenced in the execution of her Will." The court noted that all parties described Mother as

---

[8]Mother's sister was of advanced age and had difficulty walking. She was called as a witness by the defendants but permitted to testify out of order so that she would not have to wait an extended period at the courthouse.

[9]The trial court had earlier considered Plaintiffs' motion to shift the burden at the conclusion of Sharon's testimony. At that point, the trial judge stated, "The Court finds that a lot of the testimony of [Sharon] has been of questionable credibility, but the Court doesn't find any proof in the record so far that would overcome or establish the undue influence to the point of transferring the burden." Earlier, during Sharon's testimony, the trial judge indicated that he was "terribly frustrated" by Sharon's inconsistent answers and angry demeanor and that he did not understand how she could have misstated the facts regarding her bankruptcy proceedings "by 30 years."

"strong willed." The court found that Mother was "of sound mind and disposing memory," knew what she had to leave, and "knew the natural objects of her affection, so much so that she elected to write letters of explanation after the time she did her Will." The court found that Mother knew there would be consternation and explained why she did what she did. The court found that Mother "was a lady who was not influenced by anyone." It found the execution of the will "impeccable" and that Mother "acted on her own," "provided her own information," and knew exactly what she wanted to do. The court noted Mother's "rather distressing statement" before Father died to the effect that, "You're sucking up to the wrong one. I'm going to outlive him." The court added, "This is not something that is said by a person subject to influence."

The trial court did not resolve any of the factual conflicts in the testimony from trial, with the exception of the issue about the CD. The trial court found that Mother "gave the proceeds of this Certificate of Deposit to one of the children" and "was not defrauded in that exercise." The court found that "[i]f she was going to be defrauded in that exercise, then any of the co-owners of that account could have defrauded her and never told her about it," as Roger was listed as an owner of the CD even before the transfer and could have withdrawn it by his signature alone. However, the court continued, "[t]hat's not how it was handled." Instead, the court found, "Mom was taken to the bank so that she could do this transaction that she didn't have to do, but she wanted to do." The court concluded that Mother's position was: "That's all I'm going to do. I'm not going to do anymore."

In conclusion, the court concluded that the 2013 will contained Mother's wishes, and it dismissed the will contest and affirmed the will. Plaintiffs timely filed a notice of appeal to this Court.

## II. ISSUES PRESENTED

Plaintiffs present the following issue for review on appeal:

Whether the trial court erred when it held that the proof at trial overcame the presumption of undue influence and established, by clear and convincing evidence, that the Last Will and Testament of Laura Copeland Farmer ["Mother"] was fair to [Mother] and that her daughter, Sharon [], did not unduly influence [Mother] in the adoption of [Mother's] Last Will and Testament.

For the following reasons, we vacate the decision of the trial court and remand for further proceedings.

17

## III. STANDARD OF REVIEW

Tennessee Rule of Civil Procedure 41.02 provides, in relevant part:

> (2) After the plaintiff in an action tried by the court without a jury has completed the presentation of plaintiffs evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. . . . The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court grants the motion for involuntary dismissal, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment.

Tenn. R. Civ. P. 41.02(2). A trial court may also order the involuntary dismissal of an action *sua sponte*. *Harris v. Baptist Mem'l Hosp.*, 574 S.W.2d 730, 731 (Tenn. 1978). A Rule 41.02(2) motion for involuntary dismissal challenges the sufficiency of the plaintiff's proof and requires the trial judge to "impartially weigh and evaluate the plaintiff's evidence just as it would after all the parties had concluded their cases" and determine if the plaintiff has failed to demonstrate a right to the relief sought. *Burton v. Warren Farmers Co-op.*, 129 S.W.3d 513, 520-21 (Tenn. Ct. App. 2002). On appeal, this Court uses the familiar standard of Tennessee Rule of Appellate Procedure 13(d) to review the trial court's disposition of the motion "because the trial court has used the same reasoning to dispose of the motion that it would have used to make a final decision at the close of all the evidence." *Id.* at 521.

A trial court's findings of fact from a bench trial are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *In re Estate of Ledford*, 419 S.W.3d 269, 277 (Tenn. Ct. App. 2013). "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citation omitted). Appellate courts afford trial courts considerable deference when reviewing issues that hinge on the credibility of the witnesses because trial courts are uniquely positioned to observe the witnesses' demeanor and conduct. *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014). We review the trial court's resolution of legal questions de novo with no presumption of correctness. *Id*.

## IV. DISCUSSION

We begin with the following guidance from the Tennessee Supreme Court:

> Courts should exercise the utmost care and caution before concluding that the solemn act of a decedent, such as execution of a deed or will, should be invalidated; but, it is equally important that they be vigilant to prevent imposition upon those who are weak, frail, and vulnerable to the influence and importunities of others who exercise a dominant position over them.

*Richmond v. Christian*, 555 S.W.2d 105, 109 (Tenn. 1977).

In Tennessee, "a will may be challenged on the basis that the decedent was subject to the undue influence of another in executing the will." *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002). "[U]ndue influence, at its core, contemplates some coercive conduct aimed at destroying the testator's free agency to such an extent that the stronger will of the proponent overcomes the will of the testator." *In re Estate of Link*, No. M2015-02280-COA-R3-CV, 2017 WL 696841, at *14 (Tenn. Ct. App. Feb. 22, 2017) (citing *Keasler v. Estate of Keasler*, 973 S.W.2d 213, 220 (Tenn. Ct. App. 1997)). Because direct evidence of undue influence is rarely available, in most cases contestants establish undue influence by proving the existence of suspicious circumstances warranting "a conclusion that the will's execution was not the product of the testator's free and independent act." *Id.* at *7 (citing *Kelley v. Johns*, 96 S.W.3d 189, 195 (Tenn. Ct. App. 2002)). The courts have not prescribed an exact formula for the type or number of suspicious circumstances necessary to invalidate a will based on undue influence. *Grimes v. Cornell*, No. M2010-01461-COA-R3-CV, 2011 WL 2015519, at *2 (Tenn. Ct. App. May 23, 2011), *perm. app. denied* (Tenn. Aug. 26, 2011). "The scope of the proof regarding undue influence is quite broad." *Mitchell v. Smith*, 779 S.W.2d 384, 388 (Tenn. Ct. App. 1989).

> The range of inquiry may cover, not only the provisions of the will itself, and the circumstances surrounding its execution, but also the mental condition of the testator, the motive and opportunity of others to influence him unduly, his relations with persons benefited by or excluded from the will, and the acts and declarations of such persons. Although none of these matters standing alone may be sufficient to establish the issues, yet taken together they may have that effect.

19

*Hager v. Hager*, 17 Tenn. App. at 161, 66 S.W.2d at 260.

The suspicious circumstances most frequently relied upon to establish undue influence are: (1) the existence of a confidential relationship between the testator and the beneficiary; (2) the testator's physical or mental deterioration; (3) the beneficiary's active involvement in procuring the will. *See In re Elam's Estate*, 738 S.W.2d 169, 173 (Tenn. 1987); *Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977); *Taliaferro v. Green*, 622 S.W.2d at 835-36.

Other recognized suspicious circumstances include: (1) secrecy concerning the will's existence; (2) the testator's advanced age; (3) the lack of independent advice in preparing the will; (4) the testator's illiteracy or blindness; (5) the unjust or unnatural nature of the will's terms; (6) the testator being in an emotionally distraught state; (7) discrepancies between the will and the testator's expressed intentions; and (8) fraud or duress directed toward the testator. *See Halle v. Summerfield*, 199 Tenn. at 454-57, 287 S.W.2d at 61-62; *American Trust & Banking Co. v. Williams*, 32 Tenn. App. 592, 606-07, 225 S.W.2d 79, 85 (1948); see also 1 *Pritchard on the Law of Wills and Administration of Estates* § 145 (4th ed. 1983); 25 *Tenn. Jur.* Wills § 24 (1985); Tennessee Pattern Instructions—Civil § 11.59.

*Id.*

When there is a confidential relationship between two parties followed by a transaction by which the dominant party receives a benefit from the weaker party, a presumption of undue influence arises that may be rebutted only by clear and convincing evidence of the fairness of the transaction. *Childress*, 74 S.W.3d at 328 (citing *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995)). "A confidential relationship is any relationship which gives one person dominion and control over another." *Id.* (citing *Mitchell*, 779 S.W.2d at 389). The party claiming the existence of a confidential relationship has the burden of proving it. *Id.*

The evidence in this case supports a finding (and the parties do not appear to dispute) that a confidential relationship existed between Sharon and Mother. Again, the core definition of a confidential relationship requires proof of dominion and control. *Currie*, 74 S.W.3d at 329. Sharon was officially named Mother's power of attorney in 2011, and Mother believed that Sharon was acting as her power of attorney even before that time. The record contains additional evidence of dominion and control due to the

20

facts that Mother lived with Sharon and depended on her for assistance with her medical needs, financial matters, and transportation.

"Once a confidential relationship has been shown and a presumption of undue influence arises, the burden shifts to the dominant party to rebut the presumption by proving the fairness of the transaction by clear and convincing evidence." *Childress*, 74 S.W.3d at 328. However, in this context, the term "fairness" does not suggest an inquiry into whether the person who benefitted from the will deserved what the will provided, or whether the testator did right by those who would ordinarily be the objects of the testator's bounty. *In re Estate of Link*, 2017 WL 696841, at *15 (quoting *Matter of Estate of Depriest*, 733 S.W.2d 74, 79 (Tenn. Ct. App. 1986)). Instead, our focus is on the testator's capacity and whether the provisions of the will were arrived at through the testator's own free agency rather than the imposition of someone else's will. *Id.*; *see also McMillin v. McMillin*, No. E2014-00497-COA-R3-CV, 2015 WL 1510766, at *5 (Tenn. Ct. App. Mar. 31, 2015), *perm. app. denied* (Tenn. July 23, 2015) (explaining that the question is not whether the weaker party's decision was a good one, but whether it was a free and independent decision rather than induced by the dominant party).

Ultimately, "[t]he issue of undue influence should be decided by the application of sound principles and good sense to the facts of each case." *Childress*, 74 S.W.3d at 329 (quotation omitted). Again, the party trying to rebut the presumption of undue influence must establish, by clear and convincing evidence, "'that the transaction was fair and not procured through undue influence.'" *In re Estate of Farmer*, No. M2013-02506-COA-R3-CV, 2014 WL 5308226, at *9 (Tenn. Ct. App. Oct. 15, 2014) (quoting *Parish v. Kemp*, No. W2007-02207-COA-R3-CV, 2008 WL 5191291, at *5 (Tenn. Ct. App. Dec. 11, 2008)). "The difficulty in proving the fairness of a transaction varies depending on the circumstances of a particular case and the strength of the presumption of undue influence." *In re Estate of Murdaugh*, No. W2011-00041-COA-R3-CV, 2011 WL 6141067, at *3 (Tenn. Ct. App. Dec. 8, 2011) (citing *Richmond*, 555 S.W.2d at 108).

The evidence presented thus far at trial has established several suspicious circumstances that, when taken together, could warrant a conclusion that Mother's will was not entirely Mother's free and independent act. Specifically, the evidence establishes: a confidential relationship between Mother and Sharon; Mother's poor physical health; Sharon taking Mother to the attorney's office when she executed the will; secrecy concerning the will's existence; unnatural terms in the will; discrepancies between the will and Mother's expressed intentions; and fraud or duress directed toward the testator. The November 2013 will was executed when Mother was 86 years old and in declining health. She began living with Sharon part-time shortly after losing her

husband and undergoing triple bypass surgery. Mother was diagnosed with pulmonary fibrosis and required oxygen every day, and she also took eight to ten pills a day for diabetes, high blood pressure, cholesterol, and other issues. According to Roger, Sharon lied to Mother about her doctor's instructions regarding returning to her own home. Sharon provided Mother with transportation and maintained a very active role in Mother's medical care, dispensing her medications, accompanying her to doctor's appointments, and communicating with medical professionals on Mother's behalf.

Sharon had power of attorney for Mother beginning in 2011 and allowed Mother to believe that she possessed power of attorney even before that date, even though she did not. Sharon insisted that her siblings were not allowed to take Mother to doctor's appointments, fill out paperwork on her behalf, or handle other matters due to Sharon's role as power of attorney, even when Sharon did not actually possess power of attorney. Sharon allegedly poisoned the relationship between Mother and Gary's wife because Sharon believed that Gary's wife was attempting to put Mother in a nursing home and interfering in her area as power of attorney (again, all while Sharon did not actually have power of attorney). Mother also began to fear that Gary's wife and Plaintiffs wanted to put her in a nursing home.

Sharon had filed for bankruptcy twice in the past and may have been balancing Mother's checkbook during this time. Mother's bank statements were mailed to Sharon's home, and Sharon's husband picked up Mother's remaining mail. Roger heard Sharon tell Mother that she had to decide how much money Mother could spend. Sharon used Mother's credit card when no documentary evidence suggests that she had authority to do so. Checks were written to Sharon from Mother's bank account on a regular basis for large sums of money. Sharon testified that she repaid over $15,000 in loans from Mother in cash but provided no proof of such payments. Sharon or her husband also received over $20,000 in additional checks from Mother's account, and according to the handwriting expert, Sharon signed Mother's name to these checks. Checks from Mother's account were also written in order to buy Sharon new appliances and windows for her home. Sharon told Mother that Roger needed a $1,000 check for his birthday then wrote one for her husband shortly thereafter. During this same timeframe, Mother complained to more than one person that she was low on money and needed to have a garage sale. Evidence was presented to suggest that Mother and Sharon had numerous altercations about money and other issues. And, Mother allegedly stated on a regular basis, "Whatever you do, don't tell Sharon."

According to Gary, Rita, and Roger, Sharon shielded Mother from interacting with them. Sharon lied or instructed others to lie about Mother's whereabouts to prevent Rita

and Gary from visiting her. When they did visit, Sharon or others acting on her behalf monitored their conversations. Sharon arranged for home health care workers to stay with Mother to ensure that no one visited and to monitor Mother's visits when they did. When Sharon learned that Mother gave Roger a key to her house, the locks were changed.

Sharon accused all of her siblings of stealing from Mother. Roger testified that Sharon also told Mother that Gary and Rita would steal things. The gun that Gary allegedly stole was found in Mother's gun safe after she died. Mother eventually told her children that she was not allowed to let them in her house because she would get in trouble with Sharon or because they might steal from her.

Plaintiffs' allegations of fraud and undue influence began long before they learned of Mother's 2013 will after her death in 2014. Roger wrote letters addressed to Mother and Sharon as early as 2011, accusing Sharon of trying to control Mother's every move and keep the other siblings away from her. He suggested in the letters that Sharon wanted to isolate Mother so that she could manipulate Mother's decisions and brainwash her into thinking that Plaintiffs wanted to take everything she owned. It was only after these letters were written that an actual power of attorney was executed, later that month. Then, in 2012, Rita wrote to Mother's attorney stating that Sharon was destroying the family for monetary reasons and manipulating Mother into believing that Plaintiffs were stealing from her. She accused Sharon of preventing Plaintiffs from getting anywhere near Mother so that Mother would be solely dependent on Sharon. Eventually, Sharon told her siblings that the neighbors had been instructed to call the police if they tried to visit Mother. Mother's sister testified that Mother was "terrified" of Roger and Rita.

Sharon always drove Mother to her attorney's office and did so on the date that Mother executed the November 2013 will. The will left the majority of the estate to Sharon even though Mother told Gary, Rita, and Roger numerous times over the years that she intended to divide her estate equally among the four children. None of the siblings knew about the November 2013 will until after Mother died. Roger testified that Sharon's husband told Mother that if she made a new will she should add a provision that anyone who contested it would receive nothing, and Mother included such a provision in her November 2013 will.

Although Mother's will was drafted by an attorney, the statements made by Mother when discussing her will with the attorney are noteworthy. The attorney testified that Mother was "under the impression" that Gary and Roger had taken guns from

23

Mother's basement. Mother told the attorney specifically that she did not leave anything to Roger because he had stolen the CD from her. She said it was transferred while she was on medication or medically fragile and that it occurred "against her wishes, and as far as she was concerned, that was his inheritance" and "all he was going to get." Notably, however, the trial court found that Mother *was not defrauded* with regard to the CD. As he aptly noted, Roger's name was already listed on the account, and he could have withdrawn the CD unilaterally. The trial court expressly found that "Mom was taken to the bank so that she could do this transaction that she didn't have to do, but *she wanted to do*." (Emphasis added.) This conclusion is supported by the testimony of Roger and also Mother's sister, who testified that Mother told her that Roger got the CD "from his daddy" and that he was given the CD to help his son with his golf tournament. However, by the time Mother executed her will in 2013, she believed, as she told her attorney and several others, that Roger had wrongfully taken the CD by taking advantage of her when she was medicated and that he effectively stole it from her.

The trial court also noted that before Father died, Mother stated that Rita was "sucking up to the wrong person." However, Rita testified that Sharon whispered in Mother's ear immediately before Mother made this statement and that Sharon started laughing immediately thereafter. Therefore, it is reasonable to conclude that Mother made this statement at Sharon's suggestion.

Because the trial court entered its order of dismissal in favor of Sharon at the close of Plaintiffs' proof, she did not have an opportunity to present her witnesses in an effort to provide clear and convincing evidence to rebut the presumption of undue influence.[10] On appeal, Sharon suggests that it was "not unnatural" for Mother to favor her over the other children because she was the one caring for Mother and seeing to her needs. However, the facts demonstrating that Sharon had a close relationship with Mother and provided her with housing and transportation, while Mother allegedly did not have a good relationship with the other siblings, "are somewhat of a double-edged sword." *See In re Estate of Murdaugh*, 2011 WL 6141067, at \*5. These facts could support Sharon's contention that it was Mother's love for Sharon and Sharon's family that led her to leave the majority of her estate to them. However, such facts can "just as easily support a finding of undue influence." *See id.* These facts do not provide clear and convincing

---

[10]We qualify this statement somewhat. Mother's elderly sister testified out of order as a matter of convenience. However, her testimony was very brief, spanning only eight pages of the trial transcript from the three-day trial. The trial judge also directed the defendants to call the attorney who prepared the will and the two witnesses who signed it at the very beginning of the trial in order to "prove the will." Defense counsel stated that he had intended to wait and call the attorney in the context of the will contest, but the trial judge instructed him to call them first. It is not clear whether he would have re-called these witnesses if the trial had proceeded to its conclusion.

24

evidence in the present case to rebut the presumption of undue influence.

Sharon also points to the fact that an attorney prepared the will. "Oftentimes, the fairness of a contested will is demonstrated by presenting evidence that the testator received independent advice in preparing the will." *In re Estate of Link*, 2017 WL 696841, at *8 (citing *In re Estate of Maddox*, 60 S.W.3d 84, 89 (Tenn. Ct. App. 2001)). However, "the existence of independent advice may not be sufficient to rebut a presumption of undue influence especially in a case, such as this, where the particular circumstances strengthen the presumption of undue influence." *In re Estate of Murdaugh*, 2011 WL 6141067, at *5.

The trial court's order did not state whether it found the presence or absence of any "suspicious circumstances." The trial court acknowledged that Sharon's argument could "be best described as 'so what.'" Specifically, before the trial court, Sharon had argued, "In [Mother's] mind Roger Keith Farmer unfairly removed $40,000.00 from [Mother's] account, and it does not matter whether that thinking was correct or incorrect, because it is only of importance the way [Mother] saw it." We disagree with this assertion. One of the "suspicious circumstances" that courts must consider in an undue influence case is "fraud or duress directed toward the testator."[11] *Mitchell*, 779 S.W.2d at 388. "Fraud (intentional misrepresentation) has been widely recognized in Tennessee as one of the suspicious circumstances that may be relied upon to establish undue influence." *Francis v. Barnes*, No. W2012-02316-COA-R3-CV, 2013 WL 5372851, at *9 (Tenn. Ct. App. Sept. 23, 2013) (citing *Kelley*, 96 S.W.3d at 196). "[U]ndue influence may be grounded on false and fraudulent representations made to the testator." *Cude v. Culberson*, 209 S.W.2d 506, 521 (Tenn. Ct. App. 1947). In order to avoid a will for undue influence of this nature, it is necessary "that the statements be false; that the testator be unable, through weakness of mind and body, or concealment of the facts, to determine the falsity of the statements and resist the influence; and that he rely and act on them rather than on other motives and inducements." *Id.*

---

[11]We note that the doctrine of undue influence is closely related to fraud but distinguishable from it. *Eledge v. Eledge*, No. M2015-01055-COA-R3-CV, 2016 WL 3178537, at *11 n.4 (Tenn. Ct. App. May 26, 2016) (*no perm. app. filed*). In many cases, both may be present. *Id.*

> [T]he basic ingredient of a fraud claim is deception, which is based on a trick or other use of false information that induces a person to dispose of his or her property in a way he or she would not otherwise have done but for the fraud, while a claim of undue influence is based on the exertion of pressure to break down a person's will power so that the person is unable to keep from doing what he or she would not otherwise have done.

*Id.*

The evidence at trial demonstrates that in the years before Mother died, she began to believe that Gary, Rita, and Roger stole numerous things from her and wanted to put her in a nursing home. Based on the evidence presented thus far, neither of these beliefs was true. The evidence further demonstrates that these false beliefs originated with Sharon. Sharon isolated Mother from Plaintiffs and controlled most aspects of Mother's daily life at a time when Mother was of advanced age and deteriorating health. Most importantly, the evidence establishes that Mother's false beliefs about these issues impacted her decision-making with regard to her will. We therefore conclude that Sharon, at this stage of the proceedings, has not proven by clear and convincing evidence that Mother's 2013 will was the product of Mother's free and independent judgment as opposed to the imposition of Sharon's influence. Because Sharon has not yet presented clear and convincing evidence to rebut the presumption that the 2013 will was procured by undue influence, we vacate the trial court's decision and remand for further proceedings.

## V. CONCLUSION

For the aforementioned reasons, the decision of the trial court is hereby vacated and remanded for further proceedings. Costs of this appeal are taxed to the appellee, Sharon Farmer Lovett, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE